No. 87-95

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

_____

IN RE THE MARRIAGE OF
ROBERT H. ROULLIER,

        Petitioner and Appellant,
  and

ERICA LEE ROULLIER,

        Respondent and Respondent.

_____

APPEAL FROM:  The District Court of the Fourth Judicial District,
              In and for the County of Missoula,
              The Honorable Douglas Harkin, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Jon E. Ellingson; Ellingson & Moe, Missoula, Montana

    For Respondent:

        Datsopoulos, MacDonald & Lind; Ronald B. MacDonald,
        Missoula, Montana

_____

Submitted on Briefs:  Sept. 10, 1987

Decided:  December 10, 1987

Filed: **DEC 10 1987**

_Ethel M. Harrison_
_____
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is a dissolution case heard before the Honorable Douglas Harkin without a jury in May of 1986. The petitioner-husband, Robert H. Roullier (hereinafter, Robert), appeals the District Court decision. The respondent-wife is Erica Roullier (hereinafter, Erica). We modify the portion of the judgment ordering a payment from Robert to achieve the purpose of equalizing the division of the marital estate, and affirm in all other respects.

Robert and Erica were married September 24, 1977 and remained married for approximately seven years. One child, a daughter named Rikki, was born to the marriage on September 15, 1978. Robert filed for dissolution February 26, 1985. At that time, Robert was 38 years of age and Erica was 34 years of age.

A decree of dissolution was entered December 30, 1985. The parties were unable to agree on the issues of child custody, support, maintenance, and the division of the marital estate, and these matters were reserved for trial. Pending trial, the parties stipulated to joint custody with Erica as the primary custodial parent, child support of $350 per month, and temporary maintenance of $1,000 per month beginning May 15, 1985.

Robert is president and chairman of the board of Davis Transport, Inc., a trucking corporation, and controls 57.16% of the corporate stock. He also controls the same percentage interest in a related partnership, Trade Street Enterprises. Previously, Robert worked as an accountant. His current salary is approximately $18,000 per month. A large portion of that salary is utilized to amortize stock purchase obligations resulting from his purchase of his interest in

Davis Transport, and his take-home pay after the payment of this obligation is approximately $4,112.97 per month. Erica holds a college degree in elementary education but has never held a full-time position in that field. Erica held the primary responsibility of maintaining the household and caring for their daughter Rikki. At the time of trial, Erica was attending paralegal training classes in Billings and earning approximately $600 per month as a part-time file clerk.

A bench trial began on May 14, 1986 and the District Court issued findings of fact and conclusions of law October 2, 1986, and a judgment on October 7, 1986. After subtracting certain assets owned by Robert prior to the marriage, the marital estate was divided in an equal fashion. Joint custody was granted with Erica as the primary custodial parent. Child support in the amount of $450 per month was ordered. Erica is to receive maintenance of $1,000 per month for four years, and $500 per month for the following two years. Erica was awarded attorney fees in the amount of $8,622.22.

Robert raises eight issues on appeal:

(1) Did the District Court properly value Robert's interest in Trade Street Enterprises?

(2) Did the District Court properly value assets owned by Robert prior to the marriage?

(3) Did the District Court correctly calculate the amount that Robert must pay to Erica to achieve an equal division of the marital estate?

(4) Did the District Court correctly find that Robert agreed to pay for all costs of a four-year college curriculum for his minor daughter?

(5) Was the award of maintenance excessive in amount and duration?

(6) Was the award of child support excessive in amount?

(7) Did the District Court properly award attorney's fees?

(8) Did the District Court commit error by ordering Robert to indemnify Erica for joint debts he was ordered to assume?

I. THE VALUATION OF TRADE STREET ENTERPRISES.

Robert holds a 57.16% interest in a partnership entity referred to as Trade Street Enterprises (T.S.E.). The District Court found the partnership had no positive or negative value for the purposes of determining the property distribution and therefore assigned a zero valuation to Robert's interest. T.S.E. is a partnership created by the owner-managers of Davis Transport, Inc. The sole source of income for T.S.E. comes from Davis Transport. At trial, Robert chose to serve as his own expert witness. Robert testified that T.S.E. was operating at a loss and valued the fair market value of his interest in this entity at negative $299,745. Robert's contention is that Erica failed to present any evidence as to the value of T.S.E. and that his negative valuation must therefore be accepted.

The District Court refused to find Robert's valuations sufficiently credible and stated,

> [G]iven the discrepancies in [Robert's] preparation of financial documentation for various purposes, his apparent willingness to create values for his own purposes, the Court is unable to adopt his assessment evaluation . . . [of] Trade Street Enterprises."

The record sufficiently supports this finding. Accordingly, the District Court properly refused to accept Robert's

4

valuation and we will not order the District Court to accept a valuation which is not credible.

The District Court's task of valuing T.S.E. was complicated by the fact that Erica's expert witness was not retained to specifically value T.S.E. Erica's expert witness clearly stated he was not rendering a specific opinion as to the value of T.S.E. and its assets. Erica contends the following testimony by her expert supports a valuation of zero:

Q. You have not been retained to do an appraisal of the equipment in Trade Street, have you?

A. No, I have not.

Q. You did render an opinion in direct examination that with regard to Trade Street where they are able to acquire in excess of $3,000,000 worth of trucks in late '84 and '85 and experience a two hundred plus thousand dollar cash shortfall, which was handled by Davis, and still render Davis profitable that, as I understand it, Trade Street was more or less operating at a wash; is that correct?

A. Yes.

Q. So do you have an opinion as to the value based on just that phenomenon of Trade Street Enterprises as of December 31, 1985?

A. Not specifically, because it is a lot more complex than to just say off the top of my head.

Q. All right. If we assume for a moment that the value of Trade Street is zero, assuming that--

A. Okay.

> Q. Taking the December 31, 1985, balance sheet or financial statement, did you, during the recess, calculate the value of Davis Transport for the purpose of coming to an asset valuation based on your figures?
>
> A. Yes. What I did was, taking like you mentioned, Davis Transport at zero, putting in 236,787 as an asset, eliminating the debt, you end up with a net worth of approximately four hundred seventy to $500,000.
>
> Q. Do you feel it appropriate to assume that Trade Street Enterprises has a value of zero for this purpose?
>
> A. It seems reasonable.

Although this testimony may indicate Erica's expert suspected T.S.E. was operating "at a wash," it fails to offer sufficient evidence alone to support the zero valuation.

The District Court was faced with a situation where one party suggested a valuation which was not credible and the other party failed to provide a specific valuation. The problem was compounded because the determination of a value for an entity such as T.S.E. is complex. Still, the District Court heard and considered an extensive amount of evidence regarding the value of T.S.E.: gross revenues of T.S.E. for 1984 and 1985; the source of those gross revenues (i.e. Davis Transport, Inc.); recent truck acquisitions for 1984 and 1985, and the truck values; state and federal tax "write-offs" associated with T.S.E.; tax benefits passing from T.S.E. in interest expenses and depreciation; the condition and resale value of trucks owned by T.S.E.; the ability of T.S.E. to meet operating expenses, amortize capital acquisition debts, and other debt obligations; documents demonstrating the cash flow analysis for T.S.E. for

6

1981 to 1985; federal tax document returns for 1984 and 1985; T.S.E. depreciation schedules; and the T.S.E. partnership agreement. Although Erica's expert did not give a specific value for T.S.E., he did offer a significant amount of testimony regarding the general financial status of T.S.E. and its relationship with Davis Transport. Finally, there was a large amount of evidence as to the worth of Davis Transport, Inc., an entity which is significantly related to T.S.E. There is a lack of an arms-length relationship between the entities and Robert testified he did not believe they could operate on an independent or separate basis. The consideration of the value of Davis Transport inevitably involved considerations of the value of T.S.E. In In Re Marriage of Johnston (Mont. 1986), 726 P.2d 322, 325, 43 St.Rep. 1808, 1812, we stated:

> In valuing the assets in a marital dissolution case, it must be noted that the District Court has broad discretion to determine net worth.

Although it may be true that the District Court was not given the best possible evidence to value the partnership, the value determination will stand unless clearly erroneous. In Re Marriage of Laster (1982), 197 Mont. 470, 477, 643 P.2d 597, 601. We affirm the District Court's valuation of T.S.E.

II. THE PREMARITAL ASSETS.

Robert contends the District Court incorrectly calculated the amount and number of assets owned by him prior to the marriage. The District Court determined that two premarital assets should be awarded outright to Robert: (1) stock in Junkermier, Clark, Campanella, and Stephens; and (2) a duplex located at 1005 Rollins. Robert contends

7

the court ignored a long list of personal assets owned by Robert prior to the marriage:

| | |
|---|---:|
| Cash on hand | $ 3,669.96 |
| Bonus receivable | 7,091.00 |
| Investments | 1,065.00 |
| Art works (cost) | 2,250.00 |
| Personal residence | 68,500.00 |
| Real estate investments | |
|    Duplex-2312 55th Street | 70,000.00 |
|    Miller Creek land | 24,000.00 |
|    Park Drive partnership | 1,500.00 |
| Personal property | 29,330.00 |
| Robert's added assets, allegedly unaccounted for by the Court, which existed prior to the marriage | $207,405.96 |

Following a decree of dissolution of marriage, the District Court shall,

> [E]quitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both.

Section 40-4-203(1), MCA. Further, in dividing property acquired before the marriage:

> [T]he court shall consider those contributions of the other spouse to the marriage, including:
>
> (a) the non-monetary contribution of a homemaker;
>
> (b) the extent to which such contributions have facilitated the maintenance of this property; and
>
> (c) whether or not the property division serves as an alternative to maintenance arrangements.

8

Section 40-4-203(1), MCA.

We have been faced with similar issues on prior occasions. In In Re Marriage of White (Mont. 1985), 708 P.2d 267, 269, 42 St.Rep. 1634, 1636, we stated:

> This Court has recognized that when property acquired by one party prior to marriage is subject to division in a dissolution proceeding, the District Court must consider the origin of the property. Herron v. Herron (1980), 186 Mont. 396, 608 P.2d 97. But the property acquired prior to marriage is still subject to division. In re the Marriage of Keepers (1984), 691 P.2d 810, 41 St.Rep. 2163. Equitable apportionment does not require the parties be returned to their premarital status. Id.

Robert claims the District Court failed to consider that the listed assets were owned by him prior to the marriage. This contention is without merit. The District Court specifically addressed and considered this issue regarding the personal residence, the duplex at 2312 55th Street, and the Miller Creek land. Additionally, the District Court heard and considered testimony regarding many of the other items on the list. For example, during Robert's testimony the following exchange took place:

Q. Now, I assume you don't know what happened to the cash on hand in terms of where that money went?

A. No.

Q. And I assume that bonus receivable was intended at some point in time?

A. That's right.

Q. It went into the marriage, is that true?

A. I would say so.

9

Q. And I note that you indicate that you had personal property worth $29,330. I realize it's some time ago, but what did that consist of?

A. It would have been consisting of our automobiles, boat, furniture, personal effects.

Q. Same boat which you have now?

A. No.

Q. Same furniture that you have now?

A. Probably not, some of it may still exist.

Q. Can you identify any of the personal property that you had then that you have now that has a value of say in excess of say $2,000?

A. Okay. You're asking for the value --excuse me, the personal property that I had then that I still have now?

Q. Right.

A. We don't have any of the vehicles. I can't think of anything off the top of my head.

The record demonstrates that the District Court heard and considered evidence regarding the premarital assets. Additionally, the list of premarital assets proposed by Robert is actually taken from an unaudited balance sheet prepared several months after the marriage. Finally, the District Court did actually award Robert two significant assets outright on the basis that they were premarital assets. For all these reasons, we affirm the District Court's determination of which assets should be awarded outright as premarital assets.

10

III. PAYMENTS REQUIRED TO ACHIEVE AN EQUAL DIVISION.

After awarding certain premarital assets to Robert, the District Court intended to equally divide the remainder. To achieve this goal it was necessary that Robert make a payment to Erica. Under the initial division, Robert received property valued at $184,485.33 and Erica received property valued at $131,753. The total difference equals $52,732.33, and the District Court ordered Robert to pay Erica this amount. Robert is correct in asserting that only one-half that amount should have been awarded to achieve the goal of equalizing the division.

Robert filed a motion to amend the District Court's judgment on October 17, 1986, and in a subsequent supporting brief he requested that this calculation be amended so that he would pay only one-half, $26,366.17. Erica now appears to agree with this position by stating in her brief that the District Court judgment "should be amended to provide for a transfer from Husband to Wife of one-half the difference in properties held before transfer or $26,366.16." There is some confusion on this matter because the District Court previously amended its decision and directed Robert to make a payment of $28,866 in an order dated December 1, 1986 and filed on December 4, 1986. Since both parties now essentially agree that the correct amount of the payment should be $26,366.16, the District Court decision and order shall be modified to reflect such an amount.

IV. COLLEGE EXPENSES

The District Court found that Robert testified:

> [H]e will pay for the costs of secondary education for the minor child of the parties, and the court finds that based upon his agreement he shall be responsible for the costs of books, room,

11

board, tuition, and fees for a four year college curriculum acceptable to the parties.

This finding is based on the following testimony by Robert:

Q. Do you have any commitment that you're willing to make with regard to college education for your child?

A. Well, I have maybe strange and different ideas on college education. I feel like I put myself through school. I feel like I really accomplished something. I didn't get any help at all. I would like to help my children. I don't want to see them get a full ride and be able to goof off during the summer and really not get any kind of a self satisfaction of having completed school.

Q. Do you have a commitment that you're willing to make in terms of defining what you are willing to do with regard to college education?

A. I'm going to help my children through school.

Q. Is there any agreement that you're willing to reach with regard to your minimum requirements?

A. Well, I hate to place a minimum requirement on me from the standpoint that I don't even know what my financial capabilities are going to be, but if I'm in a position where I can pay for basically all the books, tuition and the kids end up having to, depending on where they're living, if they're living out of town or whatever if they're going to come up with their own spending monies and stuff like that, that's the kind of arrangement that I would like to see; but I'm hesitant to say, fine, go ahead and sign on the dotted line where I'm going to provide that they're going to go to school. What would happen if I said that

12

> and I had no input, for example, on where Rikki went to school and all of a sudden she's going to school in Italy and it's costing me $2,000 a month and I can't afford it. Believe me, I want to take care of my children.

Parties to a dissolution may agree to an obligation of support for their children beyond the age of eighteen. See, Herrig v. Herrig (1982), 199 Mont. 174, 182, 648 P.2d 758, 762. Robert contends his testimony does not represent an agreement to pay for his daughter's college education.

The cited testimony demonstrates a desire to assist in paying for college expenses. Additionally, Robert indicates his assistance ought to have reasonable limitations and expresses an understandable concern that, depending upon his future income and the costs of education, he may not be able to afford this expense. We believe these potential problems were adequately addressed by the District Court's judgment which provided:

> In lieu of maintenance beyond the time set forth herein, the Husband shall be responsible for all costs of secondary college education of the minor child including, but not limited to, costs of books, room, board, tuition, fees, and travel, for a four year college curriculum <u>acceptable to the parties</u>. (Emphasis added.)

The District Court made it clear that the college curriculum must be "acceptable to the parties." Therefore, both Robert and Erica must find the curriculum acceptable. Also, if Robert's future circumstances render him unable to pay this obligation he may petition for modification pursuant to § 40-4-208, MCA.

13

## V. MAINTENANCE

The District Court ordered maintenance in the amount of $1,000 per month to commence on July 1, 1986 and end on June 1, 1990. Thereafter, payments of $500 per month were ordered for an additional two years. Robert contends the maintenance order is excessive in duration and amount. Robert states he began maintenance payments of $1,000 per month on May 15, 1985 pending trial, and that the four year period of maintenance in that amount should have begun at that time. Additionally, he states that this amount of maintenance carries no reasonable relationship to the time it will take Erica to complete paralegal training, since she could finish that training at her current rate in less than four years.

Erica's testimony supports the contention that it will take three to four years to complete her paralegal training. More importantly, pursuant to § 40-4-203, MCA, the District Court considered a variety of factors including Erica's financial resources, the standard of living established during the marriage, and Robert's ability to meet his needs while meeting the maintenance requirement. All these factors were specifically considered by the District Court in addition to the time Erica will need to complete her training. Maintenance is "a matter of judgment essentially within the broad discretion of the District Court which we may not set aside unless the District Court is clearly erroneous." In Re the Marriage of Schenck (Mont. 1984), 692 P.2d 6, 9, 41 St.Rep. 2137, 2139. We find no abuse of discretion.

## VI CHILD SUPPORT

The District Court found the needs of the minor child to amount to an expense of $590.33 per month and ordered

14

Robert to pay $450 per month in child support. The District Court arrived at this amount by using as a guideline the formula suggested in In Re the Marriage of Carlson (Mont. 1984), 693 P.2d 496, 500, 41 St.Rep. 2419, 2423. Robert contends the order is excessive in amount because the figure $4,112.97 was incorrectly used as his net income. Robert argues that his monthly maintenance payment of $1,000 should be deducted from his income and added to Erica's income before the formula is applied.

Additionally, Robert argues that monthly child support of $500 owing on two children from a prior marriage should be deducted in calculating his net income. Robert cites virtually no authority in support of his position. We note however that a consideration of other child support obligations may be appropriate. See, Uniform Child Support Guidelines (Mont. 1987), 44 St.Rep. 830, 835. Without doubt, Robert has the duty to provide for his children of a previous marriage. Still, we find no evidence that the District Court did not consider this matter. If Robert's income was reduced by $500 and the Carlson formula were strictly applied, his support obligation would equal a greater amount then that ordered by the District Court.

This Court has stated that the Carlson formula does call for the use of a net income rather than a gross income. See, In Re Marriage of Revious (Mont. 1987), 735 P.2d 301, 304, 44 St.Rep. 674, 678. However, the ultimate answer as to the proper amount of child support is not calculated with the exact precision suggested by these terms and must ultimately depend on the facts in each case. The Carlson formula was clearly presented as a guideline, and not as a strict formula to be precisely followed in all cases. Carlson specifically stated that the figures representing the earnings of the parents "must realistically reflect what the parents are

15

capable of earning using their actual earnings as a guideline." (Emphasis added.) Carlson, 693 P.2d at 500. See also, In Re the Marriage of Isaacs (Mont. 1986), 728 P.2d 1345, 1347, 43 St.Rep. 2145, 2148. The record reflects that the District Court used the Carlson formula as a guideline and we find no abuse of discretion.

There is an additional reason why we affirm the District Court on this issue. Robert fails to suggest how to take into account that the maintenance payments at the current level will last four years and an additional two years at a lower level, while the child support payments represent an obligation extending until his daughter achieves the age of majority in the year 1996. Similarly, he fails to state the time length of his previous child support obligations. It is uncertain when Robert will be relieved of those payments.

Robert's income is significant. Erica's income however, is quite modest and expected to remain so. Their daughter probably would have continued to experience an upper-middle class lifestyle had the marriage remained intact. All of these present relevant factors which must be considered. Section 40-4-204, MCA. We find no abuse of discretion by the District Court.

VII ATTORNEY'S FEES

Robert contends the District Court improperly awarded Erica attorney's fees in the amount of $8,622.22 The District Court found that Erica's income level was low and Robert's cash flow levels were more adequate to pay attorney's fees. The award of attorney's fees in such situations is addressed by § 40-4-110, MCA, which states:

> The court from time to time, after considering the financial resources of

16

both parties, may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under chapters 1 and 4 of this title and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment. The court may order that the amount be paid directly to the attorney, who may enforce the order in his name.

We have stated that the above section,

Allows the District Court to award attorney fees after considering the financial resources of both parties. An award of attorney fees under the statute is "largely discretionary with the District Court and we will not disturb its judgment in the absence of an abuse of that discretion." (Citations omitted.)

In Re the Marriage of Shirilla (Mont. 1987), 732 P.2d 397, 399, 44 St.Rep. 75, 78. See also, In Re the Marriage of Johnston (Mont. 1986), 726 P.2d 322, 326, 43 St.Rep. 1808, 1812-1813; and, In Re the Marriage of Milanovich (Mont. 1985), 697 P.2d 927, 929, 42 St.Rep. 436, 439. The record indicates that the financial resources of both parties were considered. We find no abuse of discretion in the award of attorney's fees.


VIII   INDEMNIFICATION ORDER

Robert alleges the District Court abused its discretion by ordering him to indemnify Erica for the joint debts he was ordered to assume, while not requiring a reciprocal order directed toward Erica. The District Court entered an order December 1, 1986 which added the following to the judgment: "Respondent shall hold Petitioner harmless for all debts she

17

incurs pursuant to the Judgment." This amendment clearly solves any possible problem which may have resulted from this contention by Robert.

For the foregoing reasons, we affirm the decision of the District Court, except for the modification relating to the payment by Robert to equalize the division of the marital estate.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices