IN THE SUPREME COURT OF THE STATE OF MONTANA

No. 01-247

2001 MT 146

_____

**OPINION AND ORDER**

_____

LES CAMPBELL,

Petitioner,

v.

MIKE MAHONEY, WARDEN, MONTANA

STATE PRISON; JANET COX, SUPERVISOR,

RECORDS DEPARTMENT, MONTANA

STATE PRISON,

Respondent.

¶1 This matter comes before the Court on a petition for a writ of habeas corpus. The petitioner, Les Campbell (Campbell), a prisoner at the Montana State Prison, argues that the Department of Corrections has improperly denied him good time credits for time he spent in the prison's boot camp program (Boot Camp). He contends that he has a right to these credits and, when they are deducted from his sentence, he is entitled to immediate release. We deny the petition, concluding that Campbell voluntarily relinquished his interest in the opportunity to earn good time credits when he entered the program.

## BACKGROUND

¶2 Campbell was charged by information with one count of deliberate homicide or, in the alternative, one count of negligent homicide. After pleading guilty to the negligent homicide charge, the Second Judicial District Court sentenced Campbell to five years in the Montana State Prison (MSP). Shortly thereafter, he applied for and was admitted to Boot Camp.

¶3 Boot Camp is a legislative program designed to provide an alternative means of rehabilitating young felony offenders. See §§ 53-30-401 to -403, MCA (1993). It uses physical activity, military style discipline and intensive counseling to "correct criminal and other maladaptive thought processes and behavior patterns and to instill self-discipline and self-motivation." Section 53-30-403(3)(b), MCA (1993). The program is voluntary, and inmates who successfully complete it are eligible to have their sentences reduced or converted to probation. Section 53-30-402, MCA (1993).

¶4 The Department of Corrections (Department) runs the program and is authorized to make rules for its administration. Section 53-30-403(5), MCA (1993). Pursuant to this authority, the Department determined that good time credits, normally granted to inmates simply for staying out of trouble, would conflict with the program's emphasis on positive achievement, earned rewards and the possibility of sentence reductions for successful completion. The prohibition on the award of good time credits was also designed to weed out unmotivated applicants by providing a consequence for failing to complete the program.

¶5 By statute, all applicants must read and sign a detailed, clearly written explanation of program goals, objectives, rules and criteria before being allowed to enter the program. Section 53-30-403(3)(c), MCA (1993). Campbell signed such a statement, acknowledged that he would be ineligible for good time credits and certified that his decision to enter the program was fully informed and voluntary. He ultimately spent nearly three months in Boot Camp but, owing to a series of infractions, did not complete the program. As a consequence, he earned neither a sentence reduction nor the good time credits he might have earned had he stayed in the MSP.

¶6 Campbell now claims that he has a right to good time credits for the time he spent in the Boot Camp program. He argues that the Department's refusal to award him these credits deprives him of liberty without due process of law. In addition, based on his belief

that he is entitled to these credits, Campbell claims that he is being held beyond the lawful term of his sentence. He contends that such confinement constitutes cruel and unusual punishment in violation of the Eighth Amendment and Article II, Section 22, of the Montana Constitution.

## DISCUSSION

I. The Due Process Claim

¶7 The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits states from depriving any person of life, liberty or property without due process of law. Application of this constitutional protection to Campbell's claim requires a three-part analysis. First we determine if Campbell has a protected liberty interest at stake. If so, we must determine whether the State has deprived him of that interest. Finally, we ask whether the deprivation occurred without due process.

A. Liberty Interest in Good Time Credits

¶8 The Constitution does not, itself, create a protected liberty interest in good time credits. *Wolff v. McDonnell* (1974), 418 U.S. 539, 557, 94 S.Ct. 2963, 2797, 41 L.Ed.2d 935, 951. However, under certain circumstances, states may create liberty interests that are protected by the Due Process Clause. *Sandin v. Conner* (1995), 515 U.S. 472, 483-84, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418, 429. Campbell claims that Montana's good time allowance statute created such a liberty interest in the opportunity to earn good time credits.

¶9 Campbell committed his offense on or about January 5, 1993. The good time allowance statute in effect at the time was § 53-30-105, MCA (1991). It provides that:

> The department of corrections and human services shall adopt rules providing for the granting of good time allowance for inmates employed in any prison work or activity. The good time allowance shall operate as a credit on his sentence as imposed by the court, conditioned upon the inmate's good behavior and compliance with the rules made by the department or the warden.

We have previously held that a later version of this statute, § 53-30-105, MCA (1993), creates a protected liberty interest in the opportunity for inmates to earn good time credits. *Orozco v. Day* (1997), 281 Mont. 341, 354, 934 P.2d 1009, 1016. The version under

which Campbell committed his offense differs only slightly from the 1993 version and would, undoubtedly, fall within the ambit of our due process analysis in *Orozco*. Therefore, we conclude that Campbell has a protected liberty interest in the opportunity to earn good time credits while participating in Boot Camp.

## B. Did the State Deprive Campbell of any Liberty Interest in Good Time Credits

¶10 If Campbell had served his entire sentence in the MSP and conformed his behavior to prison rules, he would have received the full amount good time authorized by statute. By applying for but failing to complete the Boot Camp program he ended up with fewer good time credits than he otherwise might have. Campbell claims that he should have received 83 additional days of good time credit for the time he spent in the Boot Camp program. Even taking this assertion as true, however, the question remains whether the difference between what Campbell could have earned and what he actually earned is a deprivation giving rise to due process protection. We conclude that it is not.

¶11 The Due Process Clause is phrased as a limitation on the State's power to act. Therefore, when an individual undertakes to voluntarily give up his own liberty there is no due process violation. See *Zinermon v. Burch* (1990), 494 U.S. 113, 117, n. 3, 110 S.Ct. 975, 979, 108 L.Ed.2d 100, 109. Campbell voluntarily entered the Boot Camp program with the hope of earning a reduced sentence or conversion of his prison term to one of probation. He knew when he entered the program that he would not receive good time credits. Accordingly, we conclude that the State has not *deprived* Campbell of anything and that his due process claim is without merit. The Due Process Clause does not require a remedy when there has been no "deprivation" of a protected interest. See *Davidson v. Cannon* (1986), 474 U.S. 344, 348, 106 S.Ct. 668, 670, 88 L.Ed.2d 677, 683.

## C. Due Process

¶12 Even if we were to conclude that the State committed an affirmative act depriving Campbell of his liberty, we could not conclude that it violated Campbell's constitutional rights when it did so. Deprivation, by state action, of a constitutionally protected liberty interest is not in itself unconstitutional. The Due Process Clause only guarantees that such action cannot be taken without appropriate process.

¶13 At its most basic level, the Due Process Clause is intended to prevent oppression and arbitrary use of government power. *Davidson*, 474 U.S. at 348, 110 S.Ct. at 979, 106 L.

Ed.2d at 670; see also *Wolff*, 418 U.S. at 558, 94 S.Ct. at 2976, 41 L.Ed.2d at 952 (the touchstone of due process is protection of the individual against arbitrary action of government). Therefore, those seeking the protection of the Due Process Clause are generally entitled only to "those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Wolff*, 41 U.S. at 557, 94 S.Ct. at 2975, 41 L.Ed.2d at 951.

¶14 The record provides ample evidence that Campbell's state-created liberty interest in good time credits was not arbitrarily abrogated. Campbell does not dispute the Department's rationale for the no good time policy. Nor does he claim that the Department coerced or compelled him to participate in the program. On the contrary, the record indicates that Campbell, himself, sought admission to Boot Camp and that he did so with full understanding of the nature of the program and the consequences of his participation. As required by statute, the Department presented him with a statement that outlined, in twenty separate points, the program's specific conditions and requirements. Campbell read and initialed each point. He certified with his signature that he agreed to enter the program voluntarily. Finally, before entering the program, he signed and dated the following disclosure:

> Offenders participating in the Boot Camp Incarceration Program **ARE NOT** entitled to earn good time credits. Successful completion [is] intended to result in a sentence reduction, as such, it will not be treated as normal incarceration.
>
> I hereby acknowledge that I have been advised I will be ineligible for **GOOD TIME** upon entering into [the Boot Camp program].

¶15 We conclude that Campbell freely chose to relinquish his interest in good time credits in order to gain the benefits of the Boot Camp program. The procedures mandated by statute and employed by the Department to insure that Campbell's choice was informed and voluntary were both appropriate under the circumstances and sufficient to insure that his state-created interest in good time credits was not arbitrarily abrogated. Consequently, we find no merit in his due process claim.

## D. The Waiver Issue

¶16 Although Campbell did not raise the waiver issue in his petition, the dissent characterizes the issue in this case as one of waiver and argues, based on our decision in

*Rothwell* v. Allstate Ins. Co., 1999 MT 50, 293 Mont. 393, 976 P.2d 512, that waiver of the right to good time credits is contrary to public policy. Anticipating significant inmate interest in the question, we address it here to avoid further expenditure of judicial resources.

¶17 In *Rothwell,* we held that a statute requiring employers to indemnify employees for business expenses incurred on behalf of the employer was not subject to contractual waiver by the employee. *Rothwell*, ¶ 16. In reaching this decision we interpreted and applied § 1-3-204, MCA, which provides:

> Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement.

This provision is found in the "Maxims of Jurisprudence" section of the Montana Code. As such, it is intended not to qualify other substantive statutory provisions but to "aid in their just application." Section 1-3-101, MCA. Achieving such a just application depends in this case, as it did in *Rothwell*, on the distinction between "a law intended solely for someone's private benefit" and "a law established for a public reason."

¶18 We note, initially, that all laws are enacted to achieve some public policy or purpose. Therefore, for § 1-3-204, MCA, to have any force at all, the term "public reason" must mean something more than "for a public purpose" or "to achieve a public policy." Beyond this, case law provides few general rules to distinguish waivable "private" benefits from nonwaivable "public" ones. We are left to extract what guidance we can from case-by-case analysis of the rule's application.

1. Nonwaivable "Public" Rights

¶19 In addition to *Rothwell*, this Court has applied the nonwaiver rule of § 1-3-204, MCA, in a series of employment cases. See *State ex rel. Neiss v. Thirteenth Jud. Dist. Court* (1973), 162 Mont. 324, 511 P.2d 979 (employees may not bargain away their right to receive statutorily-created minimum wages); *Hoehne v. Sherrodd, Inc.* (1983), 205 Mont. 365, 668 P.2d 232 (laws establishing an employee's right to receive overtime compensation are for the protection of the general public and may not be waived). Other jurisdictions with an identical nonwaiver rule have applied it to other employment situations with the same general result. See *Armendariz v. Foundation Health Psychcare Services, Inc.* (Cal. 2000), 6 P.3d 669 (against public policy to waive right to redress for

sexual harassment or discrimination in employment); *Desimone v. Allstate Ins. Co.* (N.D. Cal.1999), 1999 U.S. Dist LEXIS 20059 (no waiver of rights designed to protect employees). All of these employment cases are based on statutes designed not just to benefit employees, but to protect them from employers, a group with generally greater economic, social, or political power. In such instances, application of the nonwaiver rule makes perfect sense: allowing employers to seek a waiver from those persons a statute is intended to protect would defeat the purpose of the statute. It would allow the employer to accomplish through waiver what the statute is designed to prohibit. This suggests that at least one kind of "public reason" to which the nonwaiver rule is applicable is a legislative attempt to compensate for unequal economic or political power between groups such as employers and employees.

¶20 This Court has also applied the nonwaiver rule to contractual attempts to waive liability for future negligent conduct. *Kopischke v. First Cont. Corp.* (1980), 187 Mont. 471, 610 P.2d 668 (used car salesman cannot disclaim duty to inspect because public policy requires dealers to make sure cars are safe); *Haynes v. County of Missoula* (1973), 163 Mont. 270, 517 P.2d 370 (release relieving party from liability for future negligent conduct is against public policy).

¶21 These cases seem to reflect a general policy of protecting those with limited ability to assess risks from those with more information or ability to recognize, remedy, or control a potential harm. It may not be possible for consumers, for example, to make informed decisions about risks known only by a seller. In these cases, the nonwaiver rule again makes sense in terms of preventing waiver from defeating the statutory goal of putting these groups on a more equal footing. Someone with little ability to assess the hazards of a product or activity also has little ability to make an informed decision about whether they should waive the protections of the law and assume the risk. Therefore, a statute designed to protect the public from hazards, by placing a duty of care on those with more information or ability to control outcomes, is totally defeated if those with the greater information can ask those the statute was intended to protect to waive that protection.

## 2. Waivable "Private" Rights

¶22 In *Rothwell*, this Court cited five cases to illustrate laws considered to be for a private benefit and, thus, waivable. Two of these cases deal with waiver of notice requirements, two with unemployment compensation benefits and the last with waiver of the protections of a statute of limitations.

¶23 In *H. Earl Clack Co. v. Staunton* (1937), 105 Mont. 375, 72 P.2d 1022, we held that a statutory notice requirement enacted for the benefit of subcontractors could be waived. In another notice case, we held that waiver of a statutory notice requirement was proper where a taxpayer had the opportunity to appear and oppose a tax increase. *Anaconda Copper Mining Co. v. Ravalli County* (1919), 56 Mont. 530, 186 P. 332.

¶24 In *H. Earl Clack Co.*, a contractor attempted to avoid a contract on that grounds that it contained a waiver of a statutory notice provision designed to protect subcontractors. In determining that the notice provision could be waived, the Court seemed to rely on the fact that the contract actually provided subcontractors with the protections that the statutory notice provision was intended to provide. *H. Earl Clack Co.*, 105 Mont. at 383, 72 P.2d at 1025. In *Anaconda Copper Mining*, the relevant statute provided that taxpayers must receive notice prior to a reassessment. The taxpayer claimed that since it had not received proper notice the assessment was void. The Court held that the purpose of the notice requirement was to ensure that the taxpayer had the opportunity to be heard prior to the reassessment. Since the taxpayer in this case actually appeared and argued its case before the Board of Assessment, the Court determined that the notice requirement could be and was waived. *Anaconda Copper Mining Co.,* 56 Mont. at 534-35, 186 P. at 334. These cases suggest that, where the statutory policy is maintained, despite the waiver, the Court has tended to find a waivable right. They also indicate that, for the purposes of applying the waiver rule of § 1-3-204, MCA, the term "private benefit" is not synonymous with "individual benefit." Subcontractors and taxpayers are clearly large classes.

¶25 In *Matter of Gaither* (1990), 244 Mont. 383, 797 P.2d 208, this Court determined that a widow had the right to waive or abandon her right to receive her deceased husband's workers' compensation benefits because the right to receive those benefits was personal to her. Likewise, in *Shea v. North-Butte Co.* (1919), 55 Mont. 522, 179 P. 499, we held that an employee's election not to be bound by the Workers' Compensation Act did not constitute a waiver in violation of public policy because the law in existence at that time allowed employees to elect not to be bound by the Act, thereby preserving their right to prosecute an action for damages against an employer for injuries suffered during the course of employment. Finally, in *Parchen v. Chessman* (1914), 49 Mont. 326, 142 P. 631, this Court determined that contractual agreements lengthening or shortening the time for bringing suit are not against public policy even if such an agreement might foreclose a right of action available under the statutory limitation period. While it is difficult to glean a common rationale from these cases, they do indicate that this Court has interpreted § 1-3-204, MCA, to permit waiver of statutory rights created to serve broad public purposes and

to benefit large classes of citizens.

¶26 The dissent argues that, because the good time allowance statute was "enacted for a public purpose and protected more than just Campbell," waiver of the opportunity to earn good time credits violates public policy. As should be clear from our discussion above, however, the existence of a "public purpose" and multiple beneficiaries do not seem to be factors which distinguish nonwaivable public rights from waivable private ones. Nor can we conclude that the good time allowance statute was motivated by any of the "public reasons" that seemed to underlie our decisions in the employment or due care cases cited above. Those cases turned on the need to correct an inequality between one class of individuals and another that the statute was designed to protect (e.g. employers/employees). They employed the nonwaiver rule as a means of ensuring that the imbalance the statute was designed to correct would not be defeated by waiver.

¶27 This logic does not apply to good time. The good time statute was enacted to ease prison crowding and to provide prisoners with an incentive for good behavior. It was not enacted to protect inmates from prison administrators or to somehow put these groups on a more equal footing. Furthermore, allowing an inmate to waive his interest in the opportunity to earn good time credits does not defeat any protectionist purpose of the good time allowance statute. That is especially true where, as here, an inmate has chosen to relinquish the benefits of one legislatively-created incentive program for another.

¶28 Nor is it a general rule that prisoners may not waive their rights. This Court and the United States Supreme Court have repeatedly upheld waiver of even constitutional rights under appropriate circumstances. *State v. Okland* (1997), 283 Mont. 10, 941 P.2d 431 (right to counsel); *State v. Hill*, 2000 MT 308, 302 Mont. 415, 14 P.3d 1237 (Fifth Amendment rights); *Barker v. Wingo* (1986), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (speedy trial).

¶29 We note the case of *Ostafin v. North Dakota* (N.D. 1997), 564 N.W.2d 616, in which the Supreme Court of North Dakota held that waiver, in a plea agreement, of the right to earn good time violates public policy. Although the dissent cites this case with approval, we find this authority unpersuasive.

¶30 *Ostafin* dealt with waiver of the right to good time as part of a plea agreement. The resulting sentence included the condition that "the Defendant's sentence shall not be reduced for 'good conduct' under [North Dakota's good time allowance statute]." *Ostafin,*

564 N.W.2d at 617, n. 1. Citing one of its earlier decisions, the court stated that:

> [T]he deduction of good time credits from a sentence is a matter not within the discretion of the courts, but within the discretion of the penitentiary administration to encourage good conduct of prisoners. The legal maxim, "a law established for a public reason cannot be contravened by a private agreement," supports our decision that a defendant cannot waive a right the legislature has given to prison administration to utilize for the purpose of inducing good behavior in prison.

*Ostafin, 564 N.W.2d at 617.*

¶31 This reasoning is inapplicable to Campbell's case. First, the inmate in *Ostafin* was attempting to waive what the court said did not belong to him. In contrast, the right at issue here belongs to Campbell, not prison administrators. It is Campbell's own liberty interest in good time credits that is the subject of his putative waiver. To the extent that good time is also, as the dissent suggests, a right the legislature has created for the benefit of prison administrators, the reasoning of *Ostafin* is still inapplicable. Any administrative benefit was waived by the Department itself when it adopted Boot Camp rules which preclude good time.

¶32 Second, the court's decision in *Ostafin* was based on its conclusion that the sentencing court invaded the authority of prison administrators when it included good time ineligibility as part of a prison sentence. In Campbell's case, it was the Department, statutorily empowered with the authority to make rules for the establishment and administration of the Boot Camp program, that determined Campbell was ineligible for good time credits while in Boot Camp. The judicial invasion of administrative authority upon which the *Ostafin* court relied is completely absent in Campbell's case.

¶33 For the foregoing reasons, we find no grounds to conclude that Campbell could not voluntarily waive his interest in good time credits.

## II. Cruel and Unusual Punishment

¶34 Campbell's cruel and unusual punishment claim is predicated on his belief that he is entitled to additional good time credits. Since he voluntarily chose to forgo his opportunity to earn credits while he was in the Boot Camp program, this argument is also without merit. Campbell received all the credits to which he was entitled and the record indicates

that those credits have been properly credited against his sentence. Incarceration of a prisoner for the full term of a lawfully-imposed sentence is not cruel and unusual punishment.

¶35 THEREFORE IT IS HEREBY ORDERED that the Campbell's petition for a writ of habeas corpus is denied.

¶36 The Clerk is directed to mail a copy of this order to counsel for respondent and to Campbell, personally.

DATED this 7th day of August, 2001.

**/S/ KARLA M. GRAY**

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

/S/ PATRICIA COTTER

/S/ JIM RICE

Justice Terry N. Trieweiler dissenting.

¶37 I dissent from the majority's conclusion that Campbell could, by contract, waive his statutory right to good time credit earned while engaged in prison work and training activities.

¶38 I can fathom no explanation for the majority's decision other than to satisfy the Department of Corrections' insatiable desire to keep its overcrowded prisons filled beyond capacity and to avoid more petitions like Campbell's.

¶39 This Court has previously held that the statute pursuant to which Campbell claims a right to good time credit for

time served at boot camp creates a liberty interest in good time credit. In *Orozco v. Day* (1997), 281 Mont. 341, 354, 934 P.2d 1009, 1016, we held that:

> This statute mandated rules granting good time for work activity as a credit on an inmate's sentence. Consistent with this statute, the Department adopted Policy No. 505, which required that good time allowances provide a credit on the inmate's sentence as imposed by the court . . . .

> By these legislative and administrative actions, the State created a right to good time credit as a direct credit to inmates' sentences. As in *Wolff* [Wolff v. McDonnell (1974), 418, U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935, 951] the good time provisions contained in both § 53-30-105, MCA (1993), and Policy No. 505 directly affect the duration of inmates' confinement at the MSP. Applying the *Sandin/Wolff* due process analysis, we conclude that the State had created an interest of real substance sufficiently embraced within Fourteenth Amendment "liberty" so as to entitle Orozco to due process procedures appropriate under institutional circumstances. *See Sandin*, 515 U.S. at 483, 115 S.Ct. at 2300; *Wolff*, 418 U.S. at 557, 94 S. Ct at 2975 . . . .

¶40 We have repeatedly held that statutory benefits provided on the basis of public policy cannot be waived contractually by any individual. Our most recent decision was *Rothwell v. Allstate Ins. Co.*, 1999 MT 50, 293 Mont. 393, 976 P.2d 512.

¶41 In *Rothwell* the plaintiff, insurance agent, brought an action to require her employer, Allstate Life Insurance Company, to indemnify and reimburse her for office and other employment-related expenses incurred in the course and scope of her employment. Section 39-2-701(1), MCA (1995), requires

that "an employer must indemnify his employee . . . for all that he necessarily expends or loses in direct consequence of the discharge of his duties as such or of his obedience to the directions of the employer . . . ."

¶42 Allstate contended that Rothwell had waived her statutory right to indemnification because of provisions in Allstate's standardized employment agreement which provided that neighborhood office agents are responsible for a portion of their own office expenses. Allstate relied on § 1-3-204, MCA, which provides:

> Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement.

¶43 We held that whether or not the right to indemnity could be waived depended on whether the statutory obligation to indemnify was established for a public reason. We held that it was and after citing a long line of cases which invalidated agreements to waive statutorily-provided benefits, we held the agreement in Rothwell's contract was also invalid because it violated public policy.

¶44 Likewise in this case, the good time credit provided by statutory law in 1993 was enacted for a public purpose and protected more than just Campbell. It operated for the benefit of prison administrators to encourage good behavior and it operated for the benefit of the prison population as a whole to enhance their safety and security and to provide incentives for work and training activity and good behavior.

¶45 The public purpose of good time credits is evident from the legislative history of amendments to the good time statute. In 1983 it was pointed out that good time is an essential incentive to move prisoners through the prison system and is an important tool in managing state

institutions. *Hearing on S.B. 220 Before the Senate Judiciary Comm.,* **48th Legis. 2 (Mont. 1983) (statement of Curt Chisholm, Executive Director of the Dept. of Inst.).**

¶46 In 1991 it was noted that good time credits have a positive effect on prison overcrowding. *Hearing on H.B. 379 Before the House Judiciary Comm.,* **52nd Legis. 3 (Mont. 1991) (statement of Rep. Kasten).**

¶47 In 1993 the Legislature was told that good time credits allow the Department of Corrections to control the prison population while working to downsize prisons, *Hearing on H. B. 685 Before the Senate Comm. on Finance and Claims,* **53rd Legis. 18-19 (Mont. 1993) (statement of Rep. Ed Grady), and in 1995 the DOC advised the Legislature that an additional purpose of good time credit is to encourage inmates to participate in rehabilitation programs.** *Hearing on H.B. 356 and 357 Before the House Judiciary Comm.* **54th Legis. 19 (Mont. 1995) (statement of Rick Day, Director of Dept. of Corrections and Human Services).**

¶48 It is no more subject to contractual waiver than those benefits such as workers compensation, unemployment benefits, or overtime hourly wage protection, which are statutorily provided to employees.

¶49 The only other court which to my knowledge has decided this issue is the Supreme Court of North Dakota in *Ostafin v. North Dakota* **(1997), 564 N.W.2d 616. In that case Ostafin was sentenced to two concurrent seventeen-year sentences as part of a plea agreement in which he waived the right to have his sentence reduced for "good time" which was provided pursuant to North Dakota statute. He filed a motion to correct his sentence based on his contention that his agreement to waive good time credit was illegal. The trial court agreed and the state appealed. The North Dakota Supreme Court affirmed the trial court based on reasoning**

identical to that employed by our Court in its *Rothwell* decision. The North Dakota court stated:

> The legal maxim, "a law established for public reasons cannot be contravened by a private agreement," supports our decision . . . that a defendant cannot waive a right the legislature has given to prison administration to utilize for the purpose of inducing good behavior in prison. M.D.C.C. § 31-11-05(4). Furthermore, there can be no waiver of statutory rights if such waiver would be against public policy. M.D.C.C. § 1-02-28. The legislative purpose of good time is to improve prison behavior and thereby improve overall prison morale and well being."

564 N.W.2d at 617.

¶50 The North Dakota court got it right. The majority is clearly wrong. No one in the majority should ever tell another North Dakota joke.

¶51 The majority's effort to avoid the effect of our *Rothwell* decision illustrated in the current context by the North Dakota decision and in the process to erode the important public protection afforded by § 1-3-204, MCA, is an exercise in result-oriented sophistry.

¶52 In paragraph five of its opinion, the majority notes that by statute all applicants to boot camp are required to read and sign a written explanation of program goals, objectives, rules and criteria and that Campbell did so. The majority states as part of the same sentence that he acknowledged he would be ineligible for good time credit as if his acknowledgment was part of the same statutory requirement. It was not. There is no statutory requirement that Campbell waive his right to good time credit as a condition to admission to the boot camp program.

Furthermore, we have previously held that a state agency cannot accomplish by administrative rule what is in contravention of statutory law.

¶53 In an effort to avoid the plain language of § 1-3-204, MCA, the majority goes to great lengths to define "public reason" by citing examples of cases where a public reason has been found and then concluding that because the facts in this case are dissimilar, good time credit must not have been enacted for a public purpose. For example, the majority notes that minimum wage laws, overtime compensation laws, and laws which permit redress for sexual harassment or employment discrimination have all been found to have been enacted for a public reason. Therefore, "public reason" must be limited to those cases which protect people with little economic, social or political power from those with greater power. The majority then concludes that because the good time allowance statute did not appear to be motivated by the "public reasons" underlying our previous decision (i.e., "it was not enacted to protect inmates from prison administrators or to somehow put these groups on a more equal footing"), good time credits must not have been enacted for a public reason within the meaning of § 1-3-204, MCA. The majority opinion follows a tortuous course to avoid the obvious.

¶54 The obvious facts are that control of the prison population, downsizing prison populations, reducing prison overcrowding, motivating prisoners to work and enroll in rehabilitation programs, and managing state prisons are all publicly identified purposes for the good time credit law and are all clearly "public reasons" for the good time credit provided by statute.

¶55 The majority attempts to distinguish *Ostafin* on the grounds that Ostafin's waiver was part of a plea agreement rather than a boot camp agreement and that Ostafin's right

to good time credit for some reason did not belong to him while Campbell's right to good time credit does belong to him. How that distinction was made is not explained. No explanation is possible. Ostafin and Campbell waived the benefit of the exact same law which was enacted in both states for the exact same purpose. As previously explained, good time credit in both states benefits the individual, the administrators of prisons, the prison population as a whole, and the general public who have every interest in rehabilitating prisoners and passing them through the system in as little time as possible with as little expense as possible. The right is neither Campbell's to waive nor the prison administration's to waive.

¶56 As far as I can tell, the only significant differences between Campbell's situation and Rothwell's are that Rothwell had not been convicted of a crime, was represented by counsel, and had an amicus brief filed on her behalf by the Montana Trial Lawyers Association.

¶57 Campbell has no attorney. No interest group cares about his situation and speaks out on his behalf. He has no constituency. He is part of a growing population of faceless, powerless, voiceless, warehoused people whose rights are paid lip service but rarely taken seriously by the institutions responsible for their custody. The only check on that indifference is the judiciary. Sometimes the system works. (*See e.g., MacPheat v. Mahoney,* 2000 MT 62, 299 Mont. 46, 997 P.2d 753.) Sometimes it does not. (*See e.g., Sebastian v. Mahoney*, 2001 MT 88, 305 Mont. 158, 25 P.3d 163.) That's too bad. When the rights of even the most disrespected among us are ignored, all of society is diminished.

DATED this 7th day of August, 2001.

/S/ TERRY N. TRIEWEILER

**Justice James C. Nelson joins in the foregoing dissent.**

**I concur with Justice Trieweiler's foregoing dissent, except that I agreed with the majority in** *Sebastian***.**

**/S/ JAMES C. NELSON**