DA 07-0425

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 449

TRACTOR & EQUIPMENT CO.,

      Plaintiff, Appellee and Cross-Appellant,

  v.

ZERBE BROTHERS, a Montana corporation,

      Defendant, Appellant and Cross-Appellee.

APPEAL FROM:    District Court of the Seventeenth Judicial District,
                In and For the County of Valley, Cause No. DV 05-51
                Honorable John C. McKeon, Presiding Judge

COUNSEL OF RECORD:

      For Appellant and Cross-Appellee:

          Robert Hurly, Attorney at Law; Glasgow, Montana

          Matthew W. Knierim; Christoffersen & Knierim, P.C.; Glasgow, Montana

      For Appellee and Cross-Appellant:

          Robert L. Sterup, Jr.; Holland & Hart, LLP; Billings, Montana

Submitted on Briefs:  June 25, 2008

Decided:  December 30, 2008

Filed:

_____
                     Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    The present case stems from an agreement between Tractor and Equipment Co. ("T&E") and Zerbe Brothers, Inc. ("Zerbe") for the sale of farm equipment in northeastern Montana. Under the terms of the agreement, known as the Consignment and Sales Agreement, T&E agreed to consign and to ultimately sell certain equipment manufactured by Caterpillar, Inc. ("CAT") to Zerbe for sale to Zerbe's customers in northeastern Montana. In 2000, T&E filed an action for a judgment declaring the Consignment and Sales Agreement void. In 2004, however, the District Court granted partial summary judgment in favor of Zerbe holding that the Consignment and Sales Agreement was subject to the protective provisions of the Montana Farm Implements Dealership Act ("MFIDA") §§ 30-11-801 through -811, MCA. The District Court denied a cross-motion for declaratory judgment as a matter of law filed by T&E. In 2007, the District Court entered Judgment in favor of Zerbe after concluding that T&E violated the MFIDA by substantially changing the competitive circumstances of the Consignment and Sales Agreement. The District Court awarded Zerbe $243,874.00 in damages, $64,575.11 in attorney fees, and $1,490.45 in costs.

¶2    Zerbe appeals, claiming the District Court underestimated its damages by failing to include certain profits received from trade-ins or profits made from sales outside a five-county area specified in the Consignment and Sales Agreement. Zerbe asks this Court to remand the action to the District Court with instructions to award $1.8 million in damages. T&E cross-appeals the damage award and the District Court's earlier determinations that the Consignment and Sales Agreement was subject to the MFIDA.

2

T&E also claims the District Court erred, in a 2005 order, by concluding that Zerbe did not waive the MFIDA by agreeing to a termination provision in the Consignment and Sales Agreement, which allowed T&E to cancel the agreement for any reason with 30 days notice to Zerbe. We affirm.

¶3     The restated issues on appeal are as follows:

¶4     I.  Did the District Court err in concluding that the MFIDA applied to the Consignment and Sales Agreement?

¶5     II.  Did the District Court err in concluding that Zerbe did not waive the MFIDA by entering into the Consignment and Sales Agreement?

¶6     III.  Did the District Court err in its calculation of Zerbe's damages?

## BACKGROUND

¶7     In the mid-1990s, T&E and Zerbe entered into discussions about Zerbe managing the sale and rental of a high-end tractor known as the Challenger tractor, which at that time was manufactured by CAT. T&E, a Montana corporation with its principal place of business in Billings, Montana, was the exclusive dealer for CAT products and equipment in parts of eastern Montana, North Dakota, and Wyoming. After a series of events not relevant to the issues on appeal, T&E executed the Consignment and Sales Agreement on July 7, 1997. The agreement, which was drafted by counsel for T&E and reviewed by counsel for Zerbe, provided that T&E would consign and ultimately sell CAT equipment to Zerbe for sale to Zerbe's customers in northeastern Montana. According to evidence set forth in the record, T&E sought to establish a relationship with Zerbe because of Zerbe's well-established relationship with customers in northeastern Montana.

3

¶8     Under the terms of the Consignment and Sales Agreement, the parts and equipment on consignment to Zerbe ("Consigned Goods") would remain the property of T&E until purchased by Zerbe for sale to its customers.  Title would also remain with T&E pending sale to Zerbe's customers, and Zerbe would keep the Consigned Goods at its facility in Glasgow.  In addition to providing periodic requests for Consigned Goods to T&E, Zerbe was also required to furnish T&E with reports detailing the goods T&E had placed on consignment with Zerbe, and any losses sustained to those goods.  It was also agreed that T&E would have "sole discretion as to which Consigned Goods" to place on consignment with Zerbe and that Zerbe would remain liable to T&E for any losses to the Consigned Goods.  In the event any loss was sustained, Zerbe was obligated under the terms of the agreement to purchase those goods.  Under paragraphs 13 and 14 of the agreement, Zerbe was precluded from selling or contracting to sell any of the Consigned Goods outside the counties of Valley, Phillips, Garfield, McCone, and Daniels.  Further, Zerbe was to "use *promotional literature, data, and information* furnished by T&E for *dissemination to customers* only in furtherance of the objectives" of the agreement.  And finally, but particularly important to this appeal, the agreement included a termination provision, which stated that "T&E has the right to terminate this Agreement *for any reason at any time* after thirty (30) days' prior written notice to Zerbe."

¶9     On March 31, 1999, T&E sent a letter to Zerbe stating that it was terminating the Consignment and Sales Agreement on April 30, 1999.  Through Counsel, Zerbe responded by stating that T&E's letter violated Montana law for the termination of agricultural dealerships.  Over a year later, on May 4, 2000, T&E filed a declaratory

4

action in the Thirteenth Judicial District Court, Yellowstone County, claiming that it was "entitled to a declaratory judgment interpreting or construing the [Consignment Agreement] and declaring the rights, status and legal relations of the parties thereto." T&E also claimed that it was "entitled to a judgment declaring that . . . the Contract is terminated." In a letter dated May 5, 2000, T&E stated the following: "[I]n view of T&E's changed business circumstances, and in the exercise of its business judgment, T&E desires to exercise its contractual right of termination consistent with the contract, effective thirty days from today's date." Zerbe then moved for a change of venue to Valley County, Montana—the location of Zerbe's business. The court granted the motion, and T&E appealed the change of venue to this Court. We affirmed the change of venue in *Tractor & Equipment Co. v. Zerbe Brothers*, 2001 MT 162, 306 Mont. 111, 32 P.3d 721.

¶10    Zerbe counterclaimed following the change of venue to Valley County, arguing that the Consignment and Sales Agreement was a "dealership" agreement under the MFIDA and that T&E's termination of the agreement was wrongful. Zerbe then moved for partial summary judgment on the issue of whether T&E violated the MFIDA by unilaterally cancelling the Consignment and Sales Agreement. On December 2, 2004, the District Court granted partial summary judgment to Zerbe that the Consignment and Sales Agreement was subject to the MFIDA. However, the District Court denied Zerbe's motion that T&E violated the MFIDA after determining that factual issues remained as to "whether T&E directly or indirectly gave notice of termination in violation of this protective provision." In the same order, the District Court determined that the "for any

5

reason at any time" 30-day termination clause found in the subject Consignment and Sales Agreement was contrary to [the MFIDA] and thus, unenforceable. Based on this determination, the District Court voided the termination provision but enforced the remainder of the agreement, citing § 28-2-604, MCA, which provides that "[w]here a contract has several distinct objects of which one at least is lawful and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." The District Court also denied T&E's cross-motion for declaratory judgment, which sought to void the entire agreement.

¶11     Thereafter, T&E filed a motion for partial reconsideration on April 4, 2005, claiming that Zerbe waived the MFIDA by agreeing to the 30-day termination provision in the Consignment and Sales Agreement. The District Court denied the motion on May 5, 2005, after determining that the MFIDA was adopted for a public reason and could not be contravened through private agreement under § 1-3-204, MCA. A bench trial was held on April 4-6, 2006. The District Court issued its Findings of Fact, Conclusions of Law and Order on November 8, 2006, and entered Judgment in favor of Zerbe on May 18, 2007. The District Court concluded that T&E violated the MFIDA by "substantially chang[ing] the competitive circumstances of the dealership agreement with Zerbe" and by failing "to give Zerbe proper notice and opportunity to rectify claimed deficiencies" under § 30-11-803, MCA, which requires a grantor of a dealership agreement to provide "at least 90 days' prior written notice . . . of termination, cancellation, nonrenewal, or substantial change in competitive circumstances" along with a description of the reasons for termination. The District Court awarded Zerbe $243,874.00 in damages, $64,575.11

6

in attorney fees, and $1,490.45 in costs. Zerbe appeals on the sole issue of whether the District Court correctly calculated its damages. T&E cross-appeals the damage award and the District Court's related orders with respect to the application of the MFIDA. Further facts are provided as necessary throughout the following discussion. We affirm the District Court on all issues.

**STANDARD OF REVIEW**

¶12   Our standard of review in appeals from summary judgment rulings is de novo. *Mickelson v. Montana Rail Link, Inc.*, 2000 MT 111, ¶ 61, 229 Mont. 348, ¶ 61, 993 P.2d 985, ¶ 61 (citing *Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 21, 297 Mont. 336, ¶ 21, 993 P.2d 11, ¶ 21. We review a district court's conclusions of law to determine whether they are correct and its findings of fact to determine whether they are clearly erroneous. *H-D Irrigating, Inc. v. Kimble Props., Inc.*, 2000 MT 212, ¶ 16, 301 Mont. 34, ¶ 16, 8 P.3d 95, ¶ 16. Finally, this Court has stated that "[a] district court's damage determination is a factual finding, which must be upheld if it is supported by substantial evidence; we will not overturn a district court unless its determination was clearly erroneous." *Semenza v. Bowman*, 268 Mont. 118, 125, 885 P.2d 451, 455 (1994). To determine whether a finding is clearly erroneous we first review the record to confirm that the finding is supported by substantial evidence. *Denton v. First Interstate Bank of Com.*, 2006 MT 193, ¶ 18, 333 Mont. 169, ¶ 18, 142 P.3d 797, ¶ 18. If substantial evidence supports the finding, we then determine whether the trial court misapprehended the effect of the evidence. *Denton*, ¶ 18. Finally, "If substantial evidence exists and the effect of the evidence has not been misapprehended," we may still conclude that a finding

is clearly erroneous, if upon reviewing the record, we are left with the "definite and firm conviction that a mistake has been made." *Denton*, ¶ 18.

## DISCUSSION

¶13 **I. Did the District Court err in concluding that the MFIDA applied to the Consignment and Sales Agreement?**

¶14 The MFIDA, enacted by the Montana Legislature in 1985, provides broad protections to agricultural implement dealers and states that "[n]o grantor may, directly or indirectly, terminate, cancel, fail to renew, or substantially change the competitive circumstances of a dealership agreement without good cause." Section 30-11-802, MCA. A "grantor" under the MFIDA is a "person who grants a dealership." Section 30-11-801(9), MCA. A "dealer" is defined as a "person who is a grantee of a farm implements dealership situated in this state." Section 30-11-801(2), MCA. A "farm implement" under the MFIDA, includes "any vehicle, machine, or attachment designed or adapted and used exclusively for agricultural operations . . . ." Section 30-11-801(7), MCA. Significant to this case, is the definition of "dealership" under the MFIDA, which is broadly defined as "a contract or agreement, expressed or implied, whether oral or written . . . by which a person is granted the right to sell or distribute farm implements, in which there is a community of interest in the business of offering, selling, or distributing farm implements." Section 30-11-801(3), MCA. Therefore, two factors are required for the establishment of a "dealership" agreement under the MFIDA: (1) "a right to sell or distribute farm implements;" and (2) a "community of interest." While "a right to sell or distribute" is not defined, the MFIDA does provide a definition for "community of

8

interest." Under § 30-11-801(1), MCA, "community of interest" is defined as "a continuing financial interest that the grantor and grantee have in common." Although "community of interest" is a determinative factor in the applicability of the MFIDA, further explanation or clarification of "a continuing financial interest that the grantor and grantee have in common" is not provided under the MFIDA, and we have not previously addressed the scope of this term.

¶15    In its 2004 order, the District Court concluded that the Consignment and Sales Agreement was subject to the MFIDA and granted partial summary judgment in favor of Zerbe on that issue. In reaching this conclusion, the District Court noted a variety of terms and provisions in the Consignment and Sales Agreement, which, according to the court, established a "continuing financial interest" and thus, a "dealership" agreement under the MFIDA. Specifically, the District Court noted that:

> ZERBE had a locked-in purchase price prior to consignment and thus, its financial interest would be to promote the sale of these farm implements among its customer base for the agreed purchase price and more. T&E sought the promotion and protection of it's [sic] financial interest by the consignment of these implements for resale to ZERBE's customers, by mandating property and casualty insurance on the Consigned Goods, by obtaining monthly reports, by limiting competitive products, and by furnishing promotional literature, data and information.

After evaluating these terms, the District Court determined that T&E's "continuing financial interest in common with ZERBE" was its interest "to 'ultimately sell' the Challenger tractors for at least the price negotiated with Zerbe." Based on these findings, the District Court held that the Consignment and Sales Agreement constituted a "dealership" agreement under the MFIDA. The District Court also noted that T&E failed

9

"to present material and substantial evidence to raise a genuine issue of material fact" as to whether the Consignment and Sales Agreement was a "dealership" agreement. Ultimately, the District Court's determination that the Consignment and Sales Agreement was a "dealership" agreement under the MFIDA served as the basis of the court's later decisions and its damage award.

¶16 On appeal, T&E claims the District Court erred by determining that the Consignment and Sales Agreement was subject to the protective provisions of the MFIDA. The basis of T&E's claim is that the Consignment and Sales Agreement did not constitute a "dealership" as that term is defined under the MFIDA. Specifically, T&E claims that a "community of interest" under § 30-11-801(1), MCA, must mean something and cannot be established in this case, even though the definition of "community of interest" is broadly defined as a "continuing financial interest that the grantor and grantee have in common." Section 30-11-801(1), MCA. T&E outlines a variety of claims in support of its position that a "community of interest" cannot exist in this case, including that the "Challenger sales represented only about 10% of Zerbe [sic] revenues," that Zerbe "did not incur any capital costs" or have "personnel to handle the Challenger tractors," that Zerbe "handled the sales of the Challenger tractors for only a short period of time," and that Zerbe "typically did not have any Challengers on its lot." T&E also claims that Zerbe shared no financial risk under the agreement and "was required to purchase the large tractors it handles as a dealer for Agco, Buhler, and New Holland." Finally, T&E claims that Zerbe's profits actually increased after it stopped requesting Challengers on consignment from T&E.

10

¶17  In addition to these specific claims, T&E urges this Court to adopt a narrow interpretation of the term "community of interest" under the MFIDA, arguing that courts in other states with similar acts protecting franchise arrangements have done so. Specifically, T&E urges us to adopt an approach set forth in *Ziegler Co., Inc. v. Rexnord, Inc.*, 139 Wis. 2d 593, 407 N.W.2d 873 (1987), in which the Wisconsin Supreme Court established various guideposts for interpreting the scope of the term "community of interest." T&E finds Wisconsin's approach particularly persuasive in light of the fact that the MFIDA was modeled after the Wisconsin Fair Dealership Law, Wis. Stat. § 135 (2007).

¶18  In determining whether T&E and Zerbe shared "a community of interest" in the present case, we look to the plain language of § 30-11-801(1), MCA, which defines "a community of interest" as "a continuing financial interest that the grantor and grantee have in common." In this case, it is clear from the terms of the Consignment and Sales Agreement that a "community of interest" existed as that term is defined under the MFIDA. As the District Court noted in its 2004 order granting partial summary judgment to Zerbe, "T&E had a continuing financial interest in common with Zerbe, to-wit: to 'ultimately sell' the Challenger tractors for at least the price negotiated with Zerbe." The District Court provided additional clarification of its determination that the Consignment and Sales Agreement was a "dealership" agreement under the MFIDA in its 2006 Conclusions of Law. Specifically, the court stated that, in this case, "[t]he community of interest was more than the mere sharing of common goals." Of particular value to the court was its determination that "T&E also sought a profit on each

11

Challenger sale" and that "T&E could expect to benefit financially from Zerbe's promotion and sale of the Challenger in northeastern Montana by making sales itself in areas adjacent to [the five-county area]." The District Court also noted that "[t]he clear, explicit and unambiguous language of the Consignment Agreement . . . shows the clear intent of the parties to promote and sell Challenger tractors in northeastern Montana."

¶19 We agree with the District Court that the terms of the Consignment and Sales Agreement clearly evidenced a "community of interest" in this case. It is undisputed that T&E had an interest in having Zerbe ultimately sell the Challenger tractor in the five-county area described in the agreement—it is the only explanation for why T&E entered into the Consignment and Sales Agreement to begin with. Further, the evidence in the record clearly suggests that T&E specifically sought to establish a relationship with Zerbe because of Zerbe's well-known status as an implement dealer in the area, and that T&E benefited from the greater exposure to Zerbe's potential buyers. Zerbe likewise benefited from adding a high-end tractor such as the Challenger to its inventory. In this case, each party had something to gain financially in the agreement, and consequently, each party had something to lose if there was a substantial alteration or termination of the agreement. This financial co-dependence represents an ongoing financial relationship that establishes a "community of interest" under the MFIDA. While the definition of "community of interest" is broad, it is not ambiguous and thus, we see no need to look to another state's approach in interpreting its scope. Further, a broad reading of the statute supports the underlying purpose of the MFIDA, which is clearly to provide protections to rural dealers and communities from the harsh results of dealership cancellation without

12

good cause. To the extent that T&E argues for a narrowing of the definition of "community of interest," that is a policy matter which should be addressed to the legislature. Therefore, we hold that the District Court did not err in concluding that the Consignment and Sales Agreement was subject to the MFIDA.

¶20 **II. Did the District Court err in concluding that Zerbe did not waive the MFIDA by entering into the Consignment and Sales Agreement?**

¶21 In its 2005 order, the District Court determined that Zerbe did not waive the MFIDA by agreeing to the termination provision in the Consignment and Sales Agreement. The District Court applied § 1-3-204, MCA, which provides the following:

> Any person may waive the advantage of a law intended solely for that person's benefit. A law established for a public reason cannot be contravened by a private agreement.

To determine whether the MFDIA was "established for a public reason," the District Court examined the MFIDA's legislative history and determined that it was "designed not just to benefit the farm implement dealer but to protect such dealer and the community where the dealer is located from the termination or substantial alteration of a dealership franchise without good cause." The District Court correctly observed that the Montana Legislature showed a concern for "the loss of profitable, taxpaying, job producing, community serving businesses," and the "unequal economic or political power resulting from the acquisition of competing farm implement manufacturers by 'a large conglomerate.'" *See* MT Sen. Comm. on Agriculture, Livestock, and Irrigation, *Review of Senate Bill 407* (Feb. 18, 1985). Based on these findings, the District Court determined that the MFIDA was "a legislative attempt to compensate for this unequal

13

economic and political power" and that "[a]llowing a grantor to seek a 'for any reason at any time' waiver from those persons the statute intended to protect would defeat the very purpose of the Act."

¶22 According to T&E, however, Zerbe "waived the protections of the Act when it voluntarily signed the Consignment Agreement with a 30-day termination clause." Stated differently, T&E claims that "by signing the Consignment Agreement, Zerbe waived any right to invoke statutory terms that contradict the contract as a predicate for pursuing a damages claim." Specifically, T&E claims that Zerbe cannot claim the protections of the MFIDA for the following reasons: (1) Zerbe was aware of the clause when it signed the agreement; (2) Zerbe consulted with an attorney about the agreement and specifically inquired about the termination clause; and (3) Zerbe did not object to the termination clause at the time the agreement was made. T&E also claims it would not have entered into the clause if they had known the MFIDA would apply to the Consignment and Sales Agreement.

¶23 The primary focus of T&E's argument, however, is that the public benefit exception cannot apply in this case. Specifically, T&E claims that the Consignment and Sales Agreement's termination provision was intended solely for Zerbe's benefit and that Zerbe, as a result, voluntarily waived the protections of the MFIDA. In support of this argument, T&E suggests that § 1-3-204, MCA, has typically been applied by this Court in the context of employment agreements and cannot, therefore, apply in the context of the MFIDA. We do not agree. As noted by the District Court, we reasoned in *Campbell v. Mahoney*, 2001 MT 146, 306 Mont. 45, 29 P.3d 1034, that the non-wavier "public

14

reason" exception can apply in situations where the State Legislature has attempted to "compensate for unequal economic or political power between groups *such as* employers and employees." (Emphasis added.) By citing an example, we did not limit the application of § 1-3-204, MCA, to statutory protections relating to the employer/employee relationship. T&E appears to claim that, by entering into a private contractual arrangement, a party waives any provision of the MFIDA that is contrary to the agreement. However, that would be contrary to the very purpose the MFIDA was designed to achieve. The District Court specifically concluded that the MFIDA "was a legislative attempt to compensate for this unequal economic and political power" and that "allowing a grantor to seek a 'for any reason at any time' waiver from those persons the statute intended to protect would defeat the very purpose of the Act." It also reasoned that the legislators showed concern for the dealer *and* for the community in which the dealer operated. We agree that the MFIDA was enacted for a public purpose and that Zerbe did not waive the protective provisions of the MFIDA by entering into the Consignment and Sales Agreement.

¶24 **III. Did the District Court err in its calculation of Zerbe's damages?**

¶25 After concluding that T&E violated the MFIDA by substantially changing the competitive circumstances of the Consignment and Sales Agreement, the District Court awarded damages in favor of Zerbe pursuant to § 30-11-809, MCA, which permits the award of civil damages to a dealer who has suffered "pecuniary loss." The District Court calculated Zerbe's damages in the findings of fact from November 8, 2006, as follows:

15

(a) Start with the average annual gross profit/Challenger sale of $9,110.00; (b) deduct therefrom an 11.6% operating overhead; (c) multiply the net profit/sale ($8,053.25) by an average of 3.2 Challenger sales every 12 consecutive months; (d) multiply the average annual net profit for Challenger sales ($25,770.40) by the reasonably expected product work life of 20 years; and (e) apply at 8.5% discount rate to the $515,408.00 total. The net present value, after application of this 8.5% discount rate, is $243,874.00.

To reach this calculation, the District Court evaluated the testimony of four expert witnesses who each presented a distinct method for calculating Zerbe's damages. The District Court, however, did not find the majority of this testimony credible. Specifically, the District Court rejected the opinion of James Smrcka ("Smrcka"), a Certified Public Accountant who testified at trial that Zerbe sustained $1,917,888 in damages. Smrcka's calculation was based on what the District Court referred to as a "wash-out tree" accounting method, which allegedly traced the profits from trade-ins associated with the sale of each Challenger tractor. However, according to the District Court, the "wash-out tree" accounting method was not a suitable method for calculating Zerbe's damages. The District Court reasoned that the "wash-out tree" method was not appropriate because T&E retained no ownership interest in the trade-ins, was not entitled to any benefits from the trade-ins, and "was neither willing nor obligated to assume any of the risk related to accepting a trade." Additionally, the District Court noted that, under the Consignment and Sales Agreement, Zerbe was required to purchase the Challenger tractors prior to selling them to its customers. "This contract obligation," according to the District Court, "meant Zerbe had to come up with the cash to pay T&E in full regardless of whether or not it accepted a trade to complete a Challenger sale." Further, the District Court

16

reasoned that the "wash-out" transactions "were not part of the competitive circumstances established by the Consignment Agreement" and that "[f]or purposes of this case, these 'wash out' transactions were separate transactions" and thus, could not be included in the calculation of Zerbe's damages. The District Court also rejected Smrcka's opinion that Zerbe's annual average sale estimate was 4.7 Challenger tractors. According to the District Court, "Zerbe's 'competitive circumstances' did not include a contractual right to sell Challengers" outside the five-county area specified in the Consignment and Sales Agreement without T&E's consent, and T&E had no obligation to honor such sales. Accordingly, the District Court adjusted the annual average sale rate to 3.2 Challengers per year.

¶26 On appeal, Zerbe claims the District Court underestimated its damages, and specifically, that its findings which served as the basis of the damage determination were "inadequate, speculative, and outside the record." Zerbe's primary claim is that the District Court erred by not including profits from trade-ins associated with the sale of each Challenger tractor or profits from Challenger tractor sales made outside the five-county area specified in the Consignment and Sales Agreement. Zerbe contends that the "wash-out tree" method advocated by Smrcka was a valid method for calculating Zerbe's damages. Zerbe reasons that the sale of each Challenger tractor was "intrinsically linked to the sale of the trade-in tractor or implement" and that the District Court's exclusion of these profits resulted in a significant reduction in the calculation of Zerbe's lost profits. Zerbe claims that, because of the expense of purchasing a new Challenger tractor, purchasers were almost always required to trade-in a used tractor. The value received

17

from the trade-in was then discounted from the price of the new Challenger tractor. Zerbe would then sell the trade-in tractor and so forth until a final profit, according to Zerbe, could be ascertained. Zerbe claims, that "after 'shaking out' or disposing of all the multiple trades," its average annual profit per Challenger tractor was $24,989 or $15,879 more than the average annual profit calculated by the District Court. As to profits made outside the five-county area specified in the Consignment and Sales Agreement, Zerbe argues that the District Court should have included these profits within its calculation because T&E worked with Zerbe to facilitate Challenger sales outside the five-county area. T&E counters by arguing that the "District Court was correct in rejecting Zerbe's astronomical damages claim" and the "wash-out tree" method advocated by Smrcka. In support of its argument, T&E claims that "all numbers used in the washout tree were based on guesstimates or assumptions." T&E cites testimony given by Smrcka at trial in which he agreed that the value of the trade-ins could not be determined until they were actually sold. T&E states that, if anything, the District Court actually overstated Zerbe's damages by applying an "entirely speculative" twenty-year period for Zerbe's projected lost profits and by failing to "properly account for risk in the discount rate." T&E also claims the "future sales projections exceeded actual financial risk."

¶27    As noted in the standard of review section, a district court's damage determination is a factual finding that this Court will uphold if is supported by substantial evidence and not clearly erroneous. *See Semenza*, 268 Mont. at 125, 885 P.2d at 445. We have also stated that "since the district court is in the best position to determine the proper amount of damages . . . its decision will not be disturbed 'unless the amount awarded is so grossly

18

out of proportion to the injury as to shock the conscience.'" *Harding v. Savoy*, 2004 MT 280, ¶ 45, 323 Mont. 261, ¶ 45, 100 P.3d 976, ¶ 45 (internal citations omitted). Further, while a damages judgment "must be supported by substantial evidence that is not mere guess or speculation," "mathematical precision is not required." *In re Mease*, 2004 MT 59, ¶ 42, 320 Mont. 229, ¶ 42, 92 P.3d 1148, ¶ 42. Finally, "Proof of damages must consist of a reasonable basis for computation and the best evidence obtainable under the circumstances which will enable a judge to arrive at a reasonably close estimate of the loss." *In re Mease*, ¶ 42.

¶28 In this case, there was substantial evidence in the record to support the District Court's determination that Zerbe sustained $243,874 in damages. Because T&E and Zerbe collectively challenge specific figures used by the District Court to calculate Zerbe's damages, we address only those figures contested on appeal. First, with respect to the "wash-out tree" advocated by Zerbe, we note that the central question before the District Court on this issue concerned the average gross profit received per Challenger sale. In this case, the record included transactional data for each Challenger tractor sold, including the price paid by the buyer and the amount Zerbe remitted to T&E. The record also noted that, regardless of whether Zerbe ultimately accepted a trade-in from a customer, it paid T&E in cash for the full amount of the Challenger as determined by T&E. Based on this information, the court established a gross profit per sale of $9,110. While Zerbe contends that its profit per sale should have been $24,989, as determined by using the "wash-out tree" method, we conclude that the District Court did not err in rejecting this claim. Zerbe's "wash-out tree" method used estimates of future profits

from potential trade-ins—numbers that were neither certain nor ascertainable. As T&E points out, Zerbe's own witness, Smrcka, admitted at trial that the price for the trade-ins could not be ascertained until they were actually sold by Zerbe. Consequently, we affirm the District Court's determination of the profit per sale and its rejection of the "wash-out tree" method in this case.

¶29 In addition, the District Court's decision to adjust the annual average sales rate from 4.7 to 3.2 was, contrary to Zerbe's assertions, also supported by the record in this case. The Consignment and Sales Agreement specifically provided that Zerbe was limited to a five-county selling area in northeastern Montana and T&E had no obligation under the terms of the agreement to accept sales from outside this area. Therefore, we conclude that the District Court did not err by limiting the average annual sale average to the counties provided for in the agreement. We also note that the District Court's use of a 20-year time period was based on information in the record that the Challenger had been on sale for 20 years and that there was no reason to expect that it would not be available 20 years from the time the District Court issued its findings. We determine that this was a reasonable conclusion based on the record. Finally, T&E's claim that the District Court used an improper discount rate in its calculation is equally unpersuasive. The District Court's use of an 8.5% discount rate was derived from competing discount rates introduced at trial by Zerbe and T&E. The District Court's conclusion that Zerbe's proposed rate was too low and that T&E's proposed rate was too high was based on the District Court's evaluation of the evidence and the credibility of the witnesses. In *Tefft v. State*, 271 Mont. 82, 894 P.2d 317, 325 (1995), we stated that "[t]he trial judge has the

duty to resolve conflicts in evidence and this Court gives due regard to the trial judge's superior opportunity to judge the credibility of witnesses." We also stated that "a district court is not bound by the opinion of a particular party or expert but remains free to adopt any reasonable valuation that is supported by the record." *Tefft*, 271 Mont. at 82, 894 P.2d at 325 (citing *Goodover v. Lindey's*, 255 Mont. 430, 440, 843 P.2d 765, 771 (1992)). In this case, the District Court was in the best position to evaluate the competing positions of the witnesses as to the discount rate, and there was substantial evidence in the record to support the District Court's findings on this issue. Therefore, we hold that the District Court did not err in calculating Zerbe's damages.

¶30    Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS