No. 05-215

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 193

MARK DENTON and VERNA R. DENTON,

       Plaintiffs and Appellants,

  v.

FIRST INTERSTATE BANK OF COMMERCE,
n/k/a FIRST INTERSTATE BANK,

       Defendant and Respondent.

APPEAL FROM:    The District Court of the Forth Judicial District,
                In and For the County of Missoula, Cause No. DV 98-86836,
                Honorable Edward P. McLean, Presiding Judge

COUNSEL OF RECORD:

       For Appellants:

              P. Mars Scott, Ryan A. Harrington, P. Mars Scott Law Offices,
              Missoula, Montana

       For Respondent:

              David B. Cotner, Datsopoulos, MacDonald & Lind, P.C.,
              Missoula, Montana

                      Submitted on Briefs:  February 8, 2006

                                Decided:  August 22, 2006

Filed:

_____
                      Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Mark Denton (Denton) co-signed a $101,250.00 loan (Denton loan) that the First Interstate Bank (FIB or the Bank) issued to his friend Eric "Ole" Anderson. On his own, Anderson obtained a $260,000.00 Small Business Administration loan (SBA loan) from FIB at the same time. The purpose of both loans was to purchase logging equipment with which Anderson could start a business.

¶2 Anderson's business failed and he declared bankruptcy. The Bank repossessed and sold the equipment and applied all of the proceeds to the SBA loan. Thereafter, it sought repayment of the Denton loan from Denton. Denton did not pay. As a result, the Bank initiated proceedings against business property owned by Denton and his wife which secured the loan. Denton then brought an action in the Fourth Judicial District Court, Missoula County, claiming that the purchased logging equipment was collateral for his loan and that FIB had unlawfully converted and impaired that collateral. Following a bench trial, the District Court entered judgment for the Bank. Denton appeals. We affirm.

## ISSUES

¶3 A restatement of the issues on appeal is:

¶4 Did the District Court abuse its discretion by allowing the Bank to amend its proposed findings of fact the day before the trial began?

¶5 Did the District Court err in failing to find that the Promissory Note was a contract of adhesion?

2

¶6 Did the District Court err in concluding the Bank did not impair the collateral identified in the Denton loan?

¶7 Did the District Court err in ruling that the Bank properly distributed the foreclosure sale proceeds?

## FACTUAL AND PROCEDURAL BACKGROUND

¶8 In September 1995, Anderson sought a $360,000.00 loan from FIB to purchase logging equipment with which to start his own business. The Bank denied his request, in part because Anderson had no ability to contribute equity to the transaction. FIB explained that the SBA would not loan 100% of the value of a depreciable asset.

¶9 Anderson notified his friend Denton, who was a valued FIB customer, that his loan request had been denied. Denton contacted the Bank and offered to co-sign a loan for Anderson.[1] The Bank agreed. Thereafter, FIB divided the loan into two separate loans—the SBA loan for $260,000.00 and the Denton loan for $101,250.00. The Promissory Note Denton and Anderson signed indicated that Denton's mini-warehouse operation would serve as collateral for the Denton loan. However, the Commercial Security Agreement signed by the two men identified the logging equipment to be purchased with the loan proceeds as collateral for the Denton loan. The SBA loan included a general statement that collateral consisted of "all equipment and machinery."

---

[1] The District Court later concluded that, under § 30-3-415, MCA (1995), Denton technically was an "accommodation party."

3

¶10    In April 1997, FIB notified Anderson that he was in default under the terms of the SBA loan; it also notified Anderson and Denton that the Denton loan was in default. Shortly thereafter, Anderson filed a Petition for Chapter 13 bankruptcy. Ultimately, in November 1997, Anderson petitioned for a Chapter 7 bankruptcy proceeding. On December 9, 1997, FIB was allowed to sell the logging equipment. The proceeds from the public auction totaled $160,000.00. FIB applied the net amount of $137,870.85 to Anderson's SBA loan. Anderson was granted a complete discharge of indebtedness on March 16, 1998.

¶11    In February 1998, FIB requested full repayment ($98,460.39 plus interest) from Denton of the Denton loan. Denton initially acknowledged responsibility for the debt but later refused to pay, maintaining that the Denton loan should have been paid first because he was protected as a "purchase money secured creditor." Although the Bank offered it, Denton refused to agree to a repayment schedule of the Denton loan.

¶12    On May 26, 1998, FIB prepared and filed a Notice of Sale of Denton's real property that served as collateral for the Denton loan. On July 15, 1998, Denton initiated the underlying action, seeking declaratory relief and a ruling that his loan took priority over the SBA loan. Eventually, on March 26, 2002, the District Court determined that Denton was a debtor, not a creditor, and therefore was not entitled to protection as a purchase money secured creditor. While a determination of creditor/debtor status was the only issue presented to the District Court by Denton, the court nonetheless identified, among others not relevant to

4

this appeal, an additional issue to be tried, *i.e.*, whether FIB had impaired the logging equipment collateral by failing to inform Denton that the SBA held the first lien and rights to the proceeds from the sale of this equipment in the event of a default.

¶13 A bench trial was held on December 2 and 3, 2003. On December 15, 2003, the District Court issued its Findings of Fact, Conclusions of Law and Judgment. The court found that Denton knew at the time he signed the Promissory Note that, in the event Anderson defaulted and the Bank repossessed the collateral, the sale proceeds would be applied first to the SBA loan and thereafter, if any proceeds remained, to the Denton loan. Moreover, the court found that under the express terms of the promissory agreement signed by Denton, the Bank had the right to release Anderson from liability and to release or impair the collateral.

¶14 The District Court further concluded that the Bank had not impaired the collateral. However, the court continued that Denton 1) failed to meet his burden of proof establishing impairment; 2) consented to the structure of the loan granting the SBA loan a first lien on the collateral; and 3) waived the defense of impairment by signing a promissory agreement that expressly allowed impairment. Additionally, the court determined that FIB did not fail to comply with any applicable laws pertaining to disposing of collateral and had met all the requirements of the Uniform Commercial Code (UCC). The court also held that

5

because Denton had no ownership interest in the collateral, he had no basis for his theory of conversion. Lastly, the court awarded attorney fees to the Bank.

¶15 Denton filed a timely appeal.

¶16 Additional facts will be discussed as needed for our analysis.

## STANDARD OF REVIEW

¶17 The granting or denial of a motion to amend a pleading is a discretionary ruling. *State Highway Commission v. Schmidt*, 148 Mont. 316, 318, 420 P.2d 153, 155. We review such a ruling for an abuse of discretion. *State v. Abe*, 1998 MT 206, ¶ 28, 290 Mont. 393, ¶ 28, 965 P.2d 882, ¶ 28 (citations omitted).

¶18 We apply a clearly erroneous standard using a three-part test to review a district court's findings of fact. First, we review the record to determine if the findings are supported by substantial evidence; second, if the findings are supported by substantial evidence, we will determine if the trial court has misapprehended the effect of the evidence; and third, if substantial evidence exists and the effect of the evidence has not been misapprehended, the Court may still conclude that a finding is clearly erroneous when a review of the record leaves the Court with the definite and firm conviction that a mistake has been made. We review a district court's conclusions of law to determine whether the district court correctly interpreted the applicable law. *Fiedler v. Fiedler*, 266 Mont. 133, 137, 879 P.2d 675, 678 (1994) (citations omitted).

¶19 Our standard of review of a trial court's order granting or denying attorney fees and costs is whether the court abused its discretion. *Somont Oil Co. v. A & G*

*Drilling, Inc.*, 2006 MT 90, ¶ 25, 332 Mont. 56, ¶ 25, 137 P.3d 536, ¶ 25 (citation omitted).

## DISCUSSION

## ISSUE ONE

¶20    *Did the District Court abuse its discretion by allowing the Bank to amend its proposed findings of fact the day before the trial began?*

¶21    In accordance with the District Court's Scheduling Order, both parties filed proposed findings of fact and conclusions of law by November 25, 2003, one week before trial. FIB failed to include in its November 25 original proposed findings reference to the "General Provisions" language in the Promissory Note which expressly stated that the Bank may "release any party . . . or collateral; or impair, fail to realize upon or perfect [FIB's] security interest in the collateral; and take any other action deemed necessary by [FIB] without the consent of or notice to anyone." On December 1, the day before the trial began, the Bank filed amended proposed findings of fact and conclusions of law which specifically referenced these General Provisions, and concluded that by signing the Promissory Note, Denton had consented to the General Provisions and waived defenses based on impairment.

¶22    At the start of the trial, Denton moved to quash the Bank's amended proposed findings and conclusions on the ground that the filing was untimely. Denton also requested that he be allowed to amend his findings in the event the District Court accepted the Bank's amended proposed findings and conclusions.

7

The court allowed the Bank's amended findings to be received and instructed Denton to file his amended pleading by close of trial. On December 3, Denton filed his Objection and Response to [FIB's] Amended Proposed Findings and his own Proposed Amended Findings of Fact, Conclusions of Law and Judgment.

¶23 Denton maintains on appeal that the District Court erred by allowing the Bank to amend its proposed findings and conclusions the night before trial. He claims that FIB had "never brought up the issue of the 'General Provisions' language" and had not raised waiver as an affirmative defense. The Bank refutes Denton's claim, pointing out that it raised the issue of "waiver" as an affirmative defense in its initial and amended answers to Denton's complaint and attached a copy of the Promissory Note containing the "waiver" language to its Answer. The Bank further argues that Denton was not prejudiced by FIB's amended proposed findings and conclusions because the District Court granted Denton's request to amend his own proposed findings and conclusions in response to the Bank's amended pleading.

¶24 An abuse of discretion occurs when the district court judge acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reasoning resulting in substantial injustice. *Grover v. Cornerstone Const. N.W., Inc.*, 2004 MT 148, ¶ 10, 321 Mont. 477, ¶ 10, 91 P.3d 1278, ¶ 10. Our review of the record reveals that FIB asserted waiver as an affirmative defense early in the litigation, and on multiple occasions thereafter. While FIB did not initially associate its waiver defense directly with the General Provisions' language in the

8

Promissory Note, Denton nonetheless was put on notice that FIB intended to argue that Denton had waived his right to complain that FIB had misapplied the proceeds from the collateral sale, thereby impairing his collateral.

¶25 FIB having adequately put Denton on notice of its intention to assert a waiver defense early in this litigation, the District Court's decision to allow the Bank to amend its proposed findings and conclusions to amplify its previously-claimed defense on the eve of trial was not an abuse of discretion, especially in light of the court's agreement to allow Denton to amend his proposed findings and conclusions. Therefore, we find no error.

## ISSUE TWO

¶26 *Did the District Court err in failing to find that the Promissory Note was a contract of adhesion?*

¶27 As noted above, the Bank argued that under the express language of the Promissory Note's General Provisions, Denton had waived his right to rely upon the defense of impairment. Denton argued in his Objection and Response to the Bank's amended proposed findings that this waiver provision "falls directly under the definition of a contract of adhesion, and is therefore unenforceable." The District Court did not make a finding nor render a specific legal conclusion on whether the Promissory Note was, or was not, a contract of adhesion; however, given the District Court's findings and conclusions, it is apparent the court determined that the Promissory Note as a whole was an enforceable contract.

9

¶28 Denton presents numerous complaints about the Promissory Note and its General Provisions clause: 1) the Bank prepared the Promissory Note and he had no opportunity to negotiate its terms; 2) the General Provisions were exceedingly broad and gave the Bank the power to destroy collateral without notifying the parties; 3) the General Provisions clause was difficult to find in the Promissory Note; 4) the terms of the General Provisions clause were unconscionable; 5) he did not voluntarily and intentionally relinquish the rights contained in the General Provisions clause and, therefore his waiver was invalid; and 6) the General Provisions clause was inapplicable because the Bank changed the actual terms of the Note without Denton's consent.

¶29 The Bank counters that neither the Note as a whole, nor any of its individual clauses, created a contract of adhesion. It argues that Denton presented no evidence establishing that he was denied the opportunity to negotiate the terms of the contract with the Bank. FIB further opines that inequality in bargaining power does not equate to unenforceability. In addition, the Bank points out that § 30-3-607(7)(b), MCA (1995), expressly states that "accommodation parties" will not be discharged by way of a collateral impairment claim if the accommodation party signed a contract containing a waiver of such a defense. It also asserts that because Denton acknowledged that he had studied the Promissory Note before signing it, he cannot now claim that he was unaware of the existence of the General Provisions clause. Moreover, the Bank claims that it was Denton's legal duty to execute the Note "with the prudence and care of a reasonable

businessman" and that he cannot avoid the effects of the Note by failing to exercise such care or to read the document in its entirety before signing it.

¶30 A contract of adhesion is a contract whose terms are dictated by one contracting party to another who has no voice in its formulation. Contracts of adhesion are unenforceable if not within the reasonable expectations of the weaker party or if they are unduly oppressive, unconscionable, or against public policy. *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 24, 310 Mont. 123, ¶ 24, 54 P.3d 1, ¶ 24.

¶31 Both parties rely on *Kloss* to support their claims. Kloss, a 95-year old widow, filed suit against her brokerage firm, Edward Jones (Jones) and its local manager, Paul Husted, alleging they tortiously caused her to execute a charitable remainder trust. *Kloss*, ¶¶ 6, 12. We held that the brokerage service agreements Kloss had signed constituted contracts of adhesion and, therefore, the challenged mandatory arbitration provision could not be enforced. *Kloss*, ¶¶ 27, 32. We explained:

> Contracts of adhesion arise when a standardized form of agreement, usually drafted by the party having superior bargaining power, is presented to a party, whose choice is either to accept or reject the contract without the opportunity to negotiate its terms. . . . However, mere inequality in bargaining power does not render a contract unenforceable, nor are all standardized contracts unenforceable. As a consequence of current commercial realities, form forum clauses will control, absent a strong showing it should be set aside. For such a contract or clause to be void, it must fall within judicially imposed limits of enforcement. It will not be enforced against the weaker party when it is: (1) not within the reasonable expectations of said party or (2) within the reasonable

expectations of the party, but, when considered in its context, is unduly oppressive, unconscionable, or against public policy.

*Kloss*, ¶ 24.

¶32 We determined that the contracts in *Kloss* were adhesion contracts based on the following facts and reasons, among others: 1) they were standardized form contracts prepared by Jones, and Kloss had no meaningful opportunity to negotiate the terms of the contracts; 2) because the use of the challenged arbitration clause was standard industry practice, Kloss would have been excluded from the securities market altogether had she not accepted the agreement to arbitrate; 3) acceptance of the arbitration clauses resulted in Kloss waiving several *constitutional* rights which was not within Kloss' reasonable expectations; 4) Husted typically explained the contract terms to investors but did not explain the arbitration clause to Kloss; and 5) Kloss did not read the contract but relied on Husted to explain it to her (routine practice between Kloss and Husted); therefore, she was unaware of the arbitration provision.

¶33 The analysis in *Kloss* is relevant to the case at bar, but it favors the Bank and not Denton. As argued by FIB, inequality in bargaining power does not equate to unenforceability and not all standardized contracts are unenforceable as adhesion contracts. Denton, unlike Kloss, was a sophisticated business person. There was no evidence presented that he required specific protection or was improvident in his business dealings. Moreover, the Bank agreed to enter into the transaction solely at Denton's behest. There was no evidence presented that he

attempted to negotiate the terms of the contract nor was evidence presented that he would have been unsuccessful in such attempt given his standing as a "valued FIB client."

¶34 Additionally, while it is a basic tenet of contract law that "[o]ne who executes a written contract is presumed to know the contents of the contract and to assent to those specified terms," (*Quinn v. Briggs*, 172 Mont. 468, 476, 565 P.2d 297, 301 (1977)), in the case before us, we need not *presume* Denton knew the contents of his contract, as he testified that he had "studied" the contract prior to signing it. Having done so, he cannot now claim that he was unaware of the waiver provision and that it was not within his reasonable expectation.

¶35 Lastly, § 30-3-607, MCA (1995), specifically provides that an accommodation maker's liability may be discharged upon meeting his or her burden of proof that the value of the collateral has been impaired. Section 30-3-607(7)(a) and (b), MCA (1995), also establish when liability may *not* be discharged:

> If:
> (a) the party asserting discharge consents to the event or conduct that is the basis of the discharge; or
> (b) the instrument or a separate agreement of the party provides for waiver of discharge under this section, either specifically or by general language, indicating that parties to the instrument waive defenses based on suretyship or impairment of collateral.

¶36 The District Court expressly concluded that Denton had waived his defense of collateral impairment under § 30-3-607(7), MCA (1995). Additionally, the court applied § 30-3-607(6)(a)-(d), MCA (1995), which identify causes of

13

collateral impairment warranting discharge of liability, and concluded that the actions of the Bank vis-à-vis the logging equipment collateral did not constitute impairment. As a result, Denton failed to meet his burden of proof required under § 30-3-607(4), MCA (1995).

¶37 Based on the foregoing, we conclude the Promissory Note was not a contract of adhesion, nor was the General Provisions clause unconscionable as being outside of Denton's reasonable expectations. Furthermore, we find no merit in Denton's claims that his waiver was involuntary and unintentional or that the General Provisions clause was inapplicable.

## ISSUE THREE

¶38 *Did the District Court err in concluding the Bank did not impair the collateral identified in the Denton loan?*

¶39 Denton maintains that the Bank impaired the logging equipment collateral securing his loan by using the same collateral to secure Anderson's SBA loan and subordinating Denton's loan to the SBA loan without his knowledge or agreement. Denton argues that this dual use of the collateral and the Bank's failure to disclose the SBA loan arrangements and the impact of those arrangements on his loan constitutes an impairment that relieves him of the obligation to repay the loan. He relies on § 28-11-412(2) and (3), MCA, which provide:

A surety is exonerated:
. . .

(2) to the extent to which he is prejudiced by any act of the creditor which would naturally prove injurious to the remedies of the surety or inconsistent with his rights or which lessens his security; or

14

(3) to the extent to which he is prejudiced by an omission of the creditor, when required by the surety, to do anything which it is the creditor's duty to do.

¶40 The Bank notes that, as determined by the District Court, the UCC (Title 30, MCA) applies to this transaction rather than Title 28 law governing guaranty and suretyship as argued by Denton. As noted above, under Title 30, suretyship defenses can be waived where the party consents to allowing the bank to impair the collateral. *See* Section 30-3-607(7)(a) and (b), MCA (1995).

¶41 The Bank also asserts that substantial credible evidence was presented at trial to support the District Court's conclusion that Denton "was fully informed of the structure of the loan, and the requirement that FIB grant a prior lien 'position' to the SBA on the collateral," and that he consented to such loan structure. FIB argues that in the face of disputed evidence such as was presented in this case, it is the province of the District Court to weigh the credibility of the witnesses and the evidence presented, and absent clearly erroneous findings and legally incorrect conclusions, the District Court's determination of this issue must be affirmed.

¶42 The District Court specifically found based on the trial testimony of Bank loan officer Dean Gillmore that Gillmore had explained to Denton that his loan was junior to the SBA loan and that proceeds from the repossession and sale of the logging equipment would be applied to the SBA loan first and thereafter to the Denton loan. The court also found, based on the Bank's expert's testimony, that FIB structured the Denton loan in a manner designed to limit Denton's potential

15

exposure while ensuring that Denton would not have to provide up-front cash to assist Anderson in obtaining his loan.

¶43 Our review of the record confirms that significant evidence was presented that would allow the District Court to conclude that Denton knew his loan would hold a second position lien to the SBA loan. While Denton's testimony conflicts with that of the Bank's loan officer, it is the District Court's province to weigh conflicting evidence. Therefore, we will not second-guess the District Court's determination regarding the strength and weight of conflicting testimony. Moreover, we review a district court's findings to determine whether substantial evidence supports those findings, not contrary findings. *Bonnie M. Combs-Demaio Liv. Trust v. Colony*, 2005 MT 71, ¶ 9, 326 Mont. 334, ¶ 9, 109 P.3d 252, ¶ 9 (internal citations omitted).

¶44 The District Court's findings vis-à-vis this issue are not clearly erroneous, nor are its conclusions based upon these findings incorrect.

## ISSUE FOUR

¶45 *Did the District Court err in ruling that the Bank properly distributed the foreclosure sale proceeds?*

¶46 The District Court concluded that FIB did not breach its duty to preserve the value of the collateral as required by § 30-9-207, MCA (1995), nor did it fail to comply with any applicable law when it disposed of the collateral. The court also concluded that the requirements of the UCC were satisfied by FIB and the sale was conducted in a commercially reasonable manner. Denton complains the Court

erred in so concluding and repeats his contention that he had no knowledge of the Bank's intent regarding the collateral.

¶47     As we have determined already that the District Court received substantial credible evidence upon which to conclude that Denton knew of and approved of the structure of his loan, we need only determine whether the District Court correctly concluded that FIB had distributed the collateral funds in a legally correct and commercially reasonable manner.

¶48     Section 30-9-504, MCA (1995), addressed a secured party's right to dispose of collateral after default and the effect of disposition.  It provided in relevant part that:

> (1) A secured party after default may sell, lease, or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing.  . . .  The proceeds of disposition shall be applied in the order following to:
> (a)  the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing, and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;
> (b)  the satisfaction of indebtedness secured by the security interest under which the disposition is made;
> (c)   the satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed.
> . . .
> (3)(a)  Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable.  . . . .

17

¶49 FIB's loan collection manager described at trial the process by which the Bank declared Anderson in default on the SBA note, and declared Anderson and Denton in default on the Denton loan and took possession of the collateral. She provided documents notifying both men of the sale of the collateral at public auction. FIB also submitted exhibits of the Proofs of Claim FIB filed with the U.S. Bankruptcy Court in accordance with the Bankruptcy Code. This, in conjunction with additional credible testimony by bank officials, supports the District Court's conclusion that the Bank complied with applicable laws regarding the repossession and sale of the collateral and the disbursement of proceeds.

¶50 Denton also challenges the District Court's decision regarding attorney's fees, and seeks fees and costs on appeal. Having ruled in favor of FIB, we need not address this claim.

## CONCLUSION

¶51 For the foregoing reasons we affirm the District Court.


/S/ PATRICIA COTTER


We Concur:

/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON
/S/ JIM RICE