JUSTICE RICE,
dissenting.
¶26 It is apparent to me upon reading ¶ 23 of the Opinion that the Court has allowed the alleged circumstances of the underlying liability claim to influence its analysis of the arbitration issue. While it may well be an incorrigible act to sell a motor home contaminated with animal urine, that alleged act is not the issue before the Court. No matter how egregious the alleged act by Bretz may be, our focus in this appeal should be solely upon whether the parties agreed to arbitrate the claims. Because I believe Bretz and Woodruff properly agreed to arbitrate this claim, I would affirm.
¶27 First, the contract between Bretz and Woodruff should not be considered a contract of adhesion. The primary factor distinguishing a contract of adhesion from other contracts is the lack of power the non-drafting party, typically the weaker party, has to change the terms. Zigrang v. U.S. Bancorp Piper Jaffray, Inc., 2005 MT 282, ¶ 14, 329 Mont. 239, 123 P.3d 237 (‘Contracts of adhesion arise when a party possessing superior bargaining power presents a standardized form of agreement to a party whose choice remains either to accept or reject the contract without the opportunity to negotiate its terms.” (quoting Kloss, ¶ 24)). In determining whether a party lacks bargaining power, this Court has considered whether: the superior party prepared the standardized investment agreement; the weaker *18 party had an opportunity to negotiate; and the superior party explained the consequences of the arbitration clause to the weaker party. Larsen v. Western States Ins. Agency, Inc., 2007 MT 270, ¶ 14, 339 Mont. 407, 170 P.3d 956 (citing Kloss, ¶¶ 27-28). The capstone of an adhesion contract is the weaker party’s lack of voice. Denton v. First Interstate Bank of Com., 2006 MT 193, ¶ 30, 333 Mont. 169, 142 P.3d 797.
¶28 Here, Bretz clearly provided Woodruff with a “meaningful opportunity to negotiate the terms of the contract.” Denton, ¶ 32; see Kloss, ¶ 24. One month prior to the signing of the purchase agreement, Bretz provided Woodruff with a Memorandum of Understanding summarizing the key terms which would be included in their future contract. Notably, similar to the final contract, the Memorandum is short and easily understood. It is just two pages long and presents the information in normal font-no fine print. The first paragraph of the Memorandum clearly states, in all capital letters, that the purpose of the Memorandum was to avoid any misunderstandings regarding the terms of Woodruffs prospective purchase. Although the Court concludes the contract was presented to Woodruff on a take it or leave it basis without providing an opportunity to negotiate the terms, this conclusion fails to consider the steps Bretz took to communicate the terms of the purchase to Woodruff before the contract was prepared and to allow for her input. Woodruff has not alleged that she attempted, or even thought, to negotiate any terms, yet the Court uses her lack of initiative to reason that Bretz’s actions constituted hardline salesmanship. To the contrary, Bretz’s process invited inquiries from Woodruff, which she did not make. The Court responds that this statement ‘is without any factual basis in the record,” Opinion, ¶ 21, but that is simply not true. The Memorandum’s statement to Woodruff a month prior to the closing-Please do not hesitate to ask if you have any questions”-encouraged Woodruff to do just that. Although the Court denies it, this evidence is clearly in the record. The Court further puts its selective spin on the record by holding that the Memorandum “in reality required [Woodruff] to acknowledge and accept what those terms ultimately would be.”Opinion, ¶ 21 (emphasis added). Here, in order to reach its conclusion, the Court resorts to concluding that the Memorandum did something other than what it actually said.
¶29 The Court then excuses Woodruff for not reading the contract documents, thus ignoring the long-held principle that one is presumed to know the contents of the contracts to which they agree-even the *19 contents of adhesion contracts. In a recent arbitration case, we described the duty to read one’s contract as “a basic tenet of contract law.” Denton, ¶ 34. The Court holds today that the weaker party in an adhesion contract may escape her obligations under a contract merely by claiming, ‘1 didn’t read it.” Woodruff should not be able to throw up her hands and hide behind her self-induced ignorance.
¶30 The Court then considers Woodruffs ability to understand the terms as if she had read the document, reasoning from this approach that Woodruff “did not have an understanding of the arbitration process referred to in the contract.” Opinion, ¶ 10. The Court fails to give weight to the steps Bretz took in the month prior to Woodruffs commitment to the contract to ensure Woodruff understood the terms and had an opportunity to inquire about any terms she did not understand. In bold print above the signature line of the Memorandum, Bretz cautioned Woodruff, ‘Please do not accept delivery of this vehicle unless all phases of the sale are made completely clear to you. Please do not hesitate to ask if you have any questions.” This effort by Bretz to work with the consumer should be commended, but instead it is criticized.
¶31 The Court then speculates, in contradiction to the evidence, that Bretz would not have been amenable to negotiating any terms other than price, and scolds Bretz for offering a “self-serving” suggestion that Woodruff should have asked about the terms before creating the fagade that she was committing herself to them. Self-serving as it may be, Bretz’s argument is nonetheless correct-Bretz’s approach provided a convenient opportunity to ask questions which Woodruff could have availed herself of.[1] The Court creates support for its rejection of Bretz’s consumer-helpful approach by invoking a new rule, without authority and within the same paragraph as it criticizes Bretz for citing no authority, that contract terms are per se non-negotiable if they appear on a pre-printed form. Opinion, ¶ 11 (“truly negotiable terms of such contracts are those to be inserted into the blanks”).
¶32 Although I primarily disagree with the Court’s initial determination that the contract was one of adhesion, I also disagree with its second conclusion that the arbitration clause was not reasonably within Woodruffs expectations. While the Court rejects Bretz’s argument that the Memorandum establishes Woodruff was made aware of the arbitration provision, I cannot ignore the effect of *20 this evidence: Woodruff clearly received advance written notice of the terms and had a month-long opportunity to discuss the terms prior to entering the contract. Thus, even under the Court’s new rule that the only “negotiable terms” are those which are inserted into blanks, the Court should give great weight to the blank Woodruff personally filled with her initials-acknowledging that ‘I understand the agreement that I will be signing requires binding arbitration.” The fact that the final contract contained an integration clause does not eliminate the advance notice and caution Bretz gave Woodruff of the important items to which she would be bound, and her written expression of receipt of that notice. As the Court sees it, Bretz’s extra effort to advise the consumer of the terms counts for nothing.
¶33 I dissent.
JUSTICE WARNER joins the dissent of JUSTICE RICE.

 Woodruffs arguments could likewise be classified as “self-serving.”