# FILED

03/13/2018

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 17-0116

DA 17-0116

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2018 MT 43

IN RE THE MATTER OF:
DAVID PLATT and DIANA COSSA-PLATT, collectively,

   Plaintiffs and Appellees,

and

TWIN HEARTS, LLC, a Montana limited liability company,

   Plaintiff-Intervenor and Appellee,

   v.

STEPHEN A. HELD, TWIN HEARTS SMILING HORSES, INC.,
a Montana Corporation and all other Persons Unknown, Claiming
or Who Might Claim Any Right, Title, Estate, or Interest in or Lien
or Encumbrance Upon the Real Property Described in the Complaint
Adverse to Plaintiffs' Ownership or any Cloud Upon Plaintiffs' Title
Thereto, Whether Such Claim or Possible Claim be Present or Contingent,

   Defendants and Appellants.

APPEAL FROM: District Court of the Sixteenth Judicial District,
In and For the County of Powder River, Cause No. DV-38-2014-2536
Honorable Michael B. Hayworth, Presiding Judge

COUNSEL OF RECORD:

   For Appellants:

   Jeff A. Turner, Towe, Ball, Mackey, Sommerfeld & Turner, PLLP; Billings, Montana

   For Appellees:

   Mark D. Parker, Parker, Heitz & Cosgrove, PLLC, Billings, Montana

   David J. Dietrich, Dietrich & Associates, PC, Billings, Montana
   (*Attorneys for David Platt and Diana Coss-Platt*)

   Jessica T. Fehr, Adam Warren, Moulton, Bellingham, P.C., Billings, Montana
   (*Attorneys for Twin Hearts, LLC*)

Submitted on Briefs: December 20, 2017

Decided: March 13, 2018

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Stephen Held (Held) and Twin Hearts Smiling Horses, Inc.,[1] appeal from the Findings of Fact, Conclusions of Law, and Order, Judgment, and Decree entered by the Sixteenth Judicial District Court, Powder River County, following a bench trial.  Held raises six issues, but we affirm by addressing the merits of the following:

> *1.    Did the District Court err by concluding that Platt and Welu's mutual mistake claims were not barred by the statute of limitations?*

> *2.    Did the District Court err by considering extrinsic evidence to interpret and reform the parties' contract?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     In 2005, David Platt and Diana Cossa-Platt, husband and wife, together with Steve Held and Ginger Held, husband and wife, purchased a 6,000-acre ranch near Broadus in Powder River County, Montana (the property, or ranch), for the sum of $2.2 million.  The Helds, Montana residents, lived on the property and ran a cattle ranch.  The Platts, New York residents, used the property for occasional recreational visits and as an investment.  The Platts did not have experience in managing a large rural property, so Ginger Held suggested that Platts have Steve Held serve as ranch manager and oversee Platts' investment.  To formalize this arrangement, Helds and Platts entered into an Operating Agreement under which Steve Held was designated the operator of the agricultural

---

[1]    The parties will be referred herein to by their personal names, rather than their associated business entities. Stephen Held's company is Twin Hearts Smiling Horses, Inc., and Tim Welu first operated Welu, LLC, and now Twin Hearts, LLC.

3

operation on the property, and would be responsible for its financial, legal, and day-to-day management.

¶3 In 2007, Tim Welu, an avid outdoorsman from Texas, became interested in purchasing a portion of the property, intending to make it a hunting property. Held, Platt, and Welu decided to divide the property into three parts, or "parcels," of approximately 2,000 acres each. The three-way division was relative to each party's particular goals: Held's parcel was the best for agricultural use, Welu's parcel included the best hunting ground, and Platt's parcel was the most aesthetically pleasing for recreation.

¶4 Attorney A. Lance Tonn, with whom Held had a prior relationship, was retained to coordinate the transaction (Land Sale). Not specified in the course of Tonn's representation was which party or parties he represented, the scope of his representation and engagement terms, and possible conflicts of interest or the parties' option to seek independent counsel. Held served as the parties' contact with Tonn. Welu and Platt believed that Tonn was "the attorney" for the Land Sale and believed their interests would be protected by the documents.

¶5 In December 2008, before completion of the Land Sale, the parties discussed creating "usage rights" whereby all three parties could access and use the entire ranch property. The parties verbally agreed that they would grant each other access to their respective parcels for their individual pursuits: Welu would have hunting rights, Platt would have recreational rights, and Held would have grazing rights on the entire property. A first draft of a usage agreement was circulated in early December that granted each party and their descendants a 99-year right to use the entire ranch for their specific purposes.

4

However, this draft was not acceptable to the parties, and they instead expressed a desire to narrow the terms of the usage agreement from what they had originally contemplated. On December 20, 2008, Held emailed Tonn, copying Welu and Platt, attempting to express the parties' intent. The email, which became Exhibit 25 at trial, stated, in pertinent part, as follows:

> NOT transferring the hunting, grazing and recreational rights; Lance, we've decided it's better if these 'extended rights' don't survive us, nor are they transferable. In other words, if Welu's die or sell, the only hunting rights their survivor/buyer has will be on their own land. Recreation for Platt is the same. In essence then these extended rights are only through our lifetimes. Leaving future owners to negotiate their own deals. Please use your discretion to word it.

(Hereinafter Exhibit 25.)

¶6     On December 30, the Land Sale was consummated, although the parties were not all together for the closing. Welu paid $2 million for his portion of the property. An existing loan and accompanying encumbrance on the property were satisfied, and the Helds and Platts each received $286,253.73 from the proceeds. As planned, the property was divided into three parcels pursuant to a survey, with each party owning approximately 2,000 acres. Apparently, a written agreement was used to guide the closing (Buy-Sell Agreement), but conflicting evidence was presented at trial concerning the content of this Agreement, including whether it contained language about the agreed usage rights or

5

whether it was even signed by all the parties, which could not be resolved by the document trail.[2]

¶7      After completing the Land Sale, the parties decided not to record the putative Buy-Sell Agreement so that the purchase price would be kept private, and instead contemplated preparation of a separate agreement for recording that would address their usage rights (Ancillary Agreement). In January 2009, Tonn sent drafts of the Ancillary Agreement to the parties for review, instructing that "once the Agreement has been placed in final form, I will [circulate it for signature]." The language in the Ancillary Agreement regarding the specified usage rights was identical for each party, and terminated their rights to use the entire property upon conveyance of their respective parcels to a third-party. On January 20, Welu and Held reviewed and approved the Ancillary Agreement. However, Platt never received the document. On January 21, Tonn advised the parties that mistakes in the Ancillary Agreement required its re-drafting, and provided instructions for re-circulating the Agreement. In an email sent to Tonn on July 10, Held expressed frustration that the Ancillary Agreement had not yet been recorded. On August 3, Tonn replied that he had not yet received a signed Ancillary Agreement from Held. On August 20, Held, noting a fully executed agreement with all the parties' signatures had still not been executed, asked Tonn to send a new Agreement for signatures. Consequently, on

---

[2]   The District Court found that "sources of information suggest that a buy-sell document containing 'usage rights' may have been part of the closing documents. However, these sources are not definitive in establishing that such a document was signed by all three parties."

6

August 25, Tonn emailed the parties with directions that they should sign a "previously signed" document so that a "fully signed" document could be recorded.

¶8    In October, a new draft of the agreement was circulated and signed by all the parties, and recorded (Recorded Agreement). However, the Recorded Agreement was not identical to the previous agreements. It specified that all the usage rights over the entire ranch were "exclusive" as among the three parties, but while the Agreement contained provisions terminating Platts' and Welus' rights to use the other two parcels ("on the entire ranch") upon conveyance of their parcel to a third party, Held's grazing rights contained no such termination provision.[3]

¶9    The parties were on good terms throughout these transactions and referred to each other as "partners," but things turned sour. Tragically, Tonn passed away in September, 2010. In 2011, Stephen and Ginger Held were involved in a difficult dissolution

---

[3] The Recorded Agreement provided, as to Platt:

> "In the event PLATT sells, trades, or conveys the PLATT tract to a person or entity not owned primarily by PLATT, this exclusive right for recreational purposes on the entire ranch shall terminate as of the date of recording of such conveyance."

Similarly, as to Welu:

> "In the event [Welu's entity] sells, trades, or conveys the WELU tract to a person or entity not owned primarily by WELU, this exclusive right to hunt on the entire ranch shall terminate as of the date of recording of such conveyance."

In contrast, the corresponding provision as to Held provided:

> ". . . .Held[s] are granted, during their lifetimes, exclusive use of the entire ranch for livestock grazing purposes. The HELD Tract shall be listed with the United States Department of Interior Bureau of Land Management as the base property for all grazing preferences appertaining to the entire RANCH."

Thus, there was no equivalent termination language regarding Held's grazing rights, which Held argued was merely a "scrivener's error." Held agreed that reformation of the Recorded Agreement was necessary, but only to the extent necessary to correct this inconsistency. However questionable it may be that the differences in treatment of Held's rights and the others' rights in the Recorded Agreement can be properly characterized as a "scrivener's error," we use that term in this Opinion to describe this problem.

7

proceeding that strained the relationship among the parties. In 2012, Welu sued Held in an irrigation system dispute that was ultimately appealed to this Court.[4] In 2014, Platt discovered and received an attorney's opinion that, because of the manner in which the property was surveyed for division, his parcel lacked legal access and, consequently, marketable title. When Held refused to grant an easement across his property to Platt, because he believed Platt had other access, Platt initiated this lawsuit against Held, alleging easement by express grant, prescription, and implication, and praying for reformation of the contract due to mutual mistake and fraud. Welu moved to intervene, which was unopposed and granted. Welu's complaint alleged the Recorded Agreement did not express the intent of the parties regarding usage, based on ambiguities in the Agreement and alleged misrepresentations by Held, and sought reformation, allegations in which Platt joined. Held answered both complaints, denying their allegations and asserting Welu and Platt's claims were barred by the statute of limitations.

¶10 On June 7-8, 2016, the District Court held a bench trial regarding mutual mistake and fraud in the formation of the Recorded Agreement. The parties introduced Tonn's office file, or the "Tonn File," into evidence wholesale. Following trial, the District Court entered its findings of fact, conclusions of law, and order, concluding that the relevant statutes of limitation did not accrue until after this instant lawsuit commenced, and, therefore, Platts and Welu's claims had been timely filed. The court found that "[r]eview of the Tonn file leads to the conclusion that the September 2009 Recorded Agreement was

---

[4] *See Welu v. Twin Hearts Smiling Horses, Inc.*, 2016 MT 347, 386 Mont. 98, 386 P.3d 937.

a December 2008 draft of the Ancillary Agreement signed by mistake. A 2009 revision of the Ancillary Agreement was not signed by all parties." It further found that "[t]he Recorded Agreement does not reflect the parties' intent as to the usage rights; Exhibit 25 provides significant guidance to the Court's revision to reflect the parties' meeting of the minds." The District Court reformed the Recorded Agreement consistent with its determination that "[t]he parties intended to grant each other non-exclusive, non-transferrable licenses" to use each other's property, removing the term "exclusive" from Held's grazing rights specifically as well as generally from all usage rights granted under the Agreement; granted a written, express easement in favor of Welu and Platt, as well as their costs; and denied attorney fees to all parties.

¶11 Held appeals. Further facts will be discussed herein.[5]

## STANDARDS OF REVIEW

¶12 We review a district court's factual findings for clear error. *BNSF Ry. Co. v. Cringle*, 2012 MT 143, ¶ 16, 365 Mont. 304, 281 P.3d 203. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence or if, upon reviewing the record, this Court is left with the definite

---

[5] The District Court resolved other issues not challenged on appeal, including: (1) denying Welu's motion to impound rents because of lack of evidence that would allow the court to apportion past rents received by Held for leasing out the entire ranch; (2) denying Platts' motion for a constructive trust premised on unjust enrichment because of Held's grazing leases; (3) denying Held's claim of slander of title; (4) holding Welu could not maintain a claim for actual or constructive fraud against Held; and (5) denying Welu and Platts' request for an express or prescriptive easement. The District Court also determined that Welu was entitled to two implied easements: a necessary easement and an easement from prior existing use. The court determined Platt was entitled to an easement from prior existing use.

9

and firm conviction that the district court made a mistake. *In re S.T.*, 2008 MT 19, ¶ 8, 341 Mont. 176, 176 P.3d 1054. "Substantial evidence is evidence which a reasonable mind might accept as adequate to support a conclusion, even if the evidence is weak or conflicting." *Skelton Ranch, Inc. v. Pondera County Canal & Reservoir Co.*, 2014 MT 167, ¶ 27, 375 Mont. 327, 328 P.3d 644. It need not amount to a preponderance of the evidence, but it must be more than a scintilla. *Skelton Ranch*, ¶ 27.

¶13 We review a district court's conclusions of law to determine whether the district court correctly interpreted the applicable law. *Denton v. First Interstate Bank of Commerce*, 2006 MT 193, ¶ 18, 333 Mont. 169, 142 P.3d 797.

## DISCUSSION

¶14 *1. Did the District Court err by concluding that Platt and Welu's mutual mistake claims were not barred by the statute of limitations?*

¶15 Held argues that the District Court erred in concluding that the mutual mistake claims accrued "after this lawsuit was initiated, depositions were taken, and the contents of the Tonn file were reviewed[,]" making the claims timely. The parties signed the Recorded Agreement in September 2009. Platt filed his complaint on September 26, 2014, and Welu filed his on March 5, 2015. Held argues that because the parties signed the Recorded Agreement, and the agreement was subsequently recorded, the parties could or should have compared the Recorded Agreement to previous versions of the agreement to make themselves aware of its terms, and thus, any facts necessary to discovery of a mutual mistake were available to them. He further argues that "regardless of which version of the Agreement is reviewed, the language regarding the use rights is nearly identical" so Platt

10

and Welu cannot claim "the same language regarding the use rights suddenly became different five years after the execution of the Agreement." However, while the language may have been similar, there were changes in the Recorded Agreement that granted differing rights to Held than to Platt and Welu.

¶16 The statute of limitations for an action on the grounds of fraud or mistake action is generally two years, but such claims do not accrue "until the discovery by the aggrieved party of the facts constituting the fraud or mistake." Section 27-2-203, MCA. The period of limitation does not begin until "the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party. . . ." Section 27-2-102(3), MCA. As we have explained, "[t]he statute of limitations for actions based on mutual mistake . . . begins to run when the facts are such that the party bringing the action would have discovered the mistake had he exercised ordinary diligence." *D'Agostino v. Swanson*, 240 Mont. 435, 443, 784 P.2d 919, 924 (1990) (*citing Gregory v. City of Forsyth*, 187 Mont. 132, 136, 609 P.2d 248, 251 (1980)). Further, unlike fraud, "mistake, by definition, is unintentional," so in cases of mutual mistake of fact, the "discovery" language of § 27-2-203, MCA, does not require a showing of "concealment" as a "condition precedent to recovery." *Gregory*, 187 Mont. at 139, 609 P.2d at 252. Pertinent to Held's initial argument, we have also held "the recording of an instrument is to be considered with other facts and circumstances in determining whether the plaintiff is to be charged with notice, either actual or constructive, but that the fact of recording alone will not so charge him." *Gregory*, 187 Mont. at 138-39, 609 P.2d at 252. We thus consider the District Court's determination from the evidence that the asserted mistakes in the

11

Recorded Agreement could not have been discovered by Platt and Welu by the exercise of ordinary diligence.

¶17 While some of the testimony bears on the merits of the mutual mistake claim, it was also relevant to the parties' understanding and diligence. Welu testified that, when signing the Recorded Agreement, he had "no reason to think" he was signing anything other than "an accurate document" corresponding to the Ancillary Agreement he had previously signed, and consistent with the parties' intentions as expressed in Exhibit 25. Platt agreed that Exhibit 25 accurately reflected the intent of the parties, and believed from the communications with Tonn that the Recorded Agreement reflected that intent. For his part, Held testified that he thought the usage rights among the parties were to be "reciprocal," and only upon the initiation of the lawsuit did he realize the rights were not what he understood them to be, although he believed the Agreement to be substantially accurate and needed only a minor correction for what he described as the "scrivener's error." The District Court also reviewed the entire Tonn file, including Exhibit 25 and other communications, and found that "[t]he Tonn file demonstrates that the usage rights provisions underwent multiple revisions in an effort to memorialize the then-friends' agreement to allow each other access for certain purposes."

¶18 The District Court determined that integral to the parties' failure to discover the mistake was Tonn's representation to the parties that the Recorded Agreement had been "previously signed" and simply needed to be "fully signed," which permitted a reasonable conclusion by the parties that the Recorded Agreement was the same document as the previously circulated, and partially signed, Ancillary Agreement. The District Court stated

that Tonn's representations did not put the parties on notice that they were signing a different document, and reasoned that ordinary diligence "does not require that a person carefully review his copy of a recorded document (received from an attorney) to confirm that the recorded document conforms to what he believes he signed." The District Court also reasoned that recordation was not a controlling factor here, because when "a person is notified that a document he has signed has been recorded, ordinary diligence does not require that he seek to obtain a duplicate from the Clerk and Recorder for review."

¶19 The District Court thus concluded that the mistake in the Recorded Agreement was not discoverable by ordinary diligence for multiple reasons, including: (1) the parties' initial trust and friendship; (2) the intent of the parties was correctly expressed in Exhibit 25; (3) the Ancillary Agreement accurately reflected the parties' intent about usage rights; (4) the representation by Tonn, as the attorney for the Land Sale, that the Recorded Agreement was the same agreement that had been "previously signed"; (5) the parties' reasonable assumption that the signed Recorded Agreement contained the same provisions as in the Ancillary Agreement, but that it did not; and (6) no actionable dispute existing until the easement issue arose.

¶20 The District Court's findings were supported by substantial evidence. While the grounds and reasoning cited by the District Court may not have been individually sufficient to satisfy the obligation of ordinary diligence, when the circumstances are considered as a whole, we conclude the court did not err in concluding that the claims could not have been discovered thus accrual could not have occurred until this instant lawsuit, rendering the mutual mistake claim timely filed. Because the District Court proceeded to consider

13

contract reformation on the ground of mutual mistake, we need not consider whether the court erred in also concluding that the statute of limitations did not bar the fraud claims.

¶21 *2. Did the District Court err by considering extrinsic evidence to interpret and reform the parties' contract?*

¶22 Held argues the District Court erred several ways in determining to reform the parties' Recorded Agreement, including that the District Court's failure to find ambiguity in the Agreement precluded the consideration of extrinsic evidence; the language of the Agreement was plain and no reformation was necessary except to the extent the "scrivener's error" needed to be corrected; and, in interpreting the parties' intentions, the District Court erred by determining that the Agreement would extinguish his grazing usage rights to the other parcels upon a sale of a parcel to a third party, and that his rights were non-transferrable.

¶23 Generally, when the terms of an agreement are reduced to writing by the parties, the writing is considered as containing all those terms and there can be no evidence of the terms of the agreement other than the contents of the writing. Section 28-2-905(1), MCA. However, an exception to this rule permits extrinsic evidence to be admitted when a mistake or other imperfection of the writing is put at issue. Section 28-2-905(1)(a), MCA; *Thibodeau v. Bechtold*, 2008 MT 412, ¶ 19, 347 Mont. 277, 198 P.3d 785. Section 28-2-1611, MCA, authorizes a court to revise a contract based on mistake:

> **When written contract may be revised by court**. When, through fraud or mutual mistake of the parties or a mistake of one party while the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved so as

14

to express that intention, so far as it can be done without prejudice to rights acquired by third persons in good faith and for value.

When so revising a contract, the court must presume the parties intended an equitable and conscientious agreement in revising a contract, *see* § 28-2-1612, MCA, and a contract is to be interpreted to give effect to the mutual intent of the parties. *See* § 28-3-301, MCA. Revision of a contract requires that a mistake be established by clear and convincing evidence. *Thibodeau*, ¶ 23. "A mutual mistake occurs when, at the time the contract is made, the parties share a common misconception about a vital fact upon which they based their bargain." *South v. Transportation Ins. Co.*, 275 Mont. 397, 401, 913 P.2d 233, 235 (1996) (citations omitted). A mutual mistake regarding a material fact is "so substantial and fundamental" a mistake that it "defeat[s] the object of the parties in making the contract." *Keller v. Liberty Northwest, Inc.*, 2010 MT 279, ¶ 23, 358 Mont. 448, 246 P.3d 434. "Contract law does not uphold agreements which defeat the object of the parties." *Keller*, ¶ 24.

¶24 Held argues that because the District Court did not find that the Agreement contained an ambiguity, it "erred in receiving evidence and determining the interpretation of the Agreement based upon the intent of the parties." It is correct that an ambiguity in a contract can require the consideration of extrinsic evidence regarding the parties' intent. *See Mary J. Baker Revocable Trust v. Cenex Harvest States Coops., Inc.*, 2007 MT 159, ¶ 55, 338 Mont. 41, 164 P.3d 851 (if the court determines that an ambiguity is present in the instrument, then "extrinsic evidence may be introduced at trial to allow the trier of fact to determine the intent of the parties in entering into the contract."). However, in the

context of a claim of mutual mistake in the formation of the written agreement, an ambiguity is not necessarily required. Section 28-2-1611, MCA, provides that, when a written contract, because of a mistake, "does not truly express the intention of the parties, it may be revised on the application of a party aggrieved so as to express that intention[.]" Such was the claim here—that the Recorded Agreement as written did not accurately reflect the parties' intentions.

¶25 In addition to considering the evidence cited in the above statute of limitations discussion regarding the parties' understanding of the Recorded Agreement, the District Court found that the Tonn File demonstrated the usage rights provisions had undergone multiple revisions to capture the intent of the parties, but this intent was never ultimately memorialized in a signed agreement. The first draft in early December 2008 contained a 99-year reciprocal lease option for usage rights, which Welu testified did not express the intent of the parties, leading to the email to Tonn that became Exhibit 25. The next draft, the Ancillary Agreement, was intended to embody the wishes of the parties as expressed in Exhibit 25, but was not reviewed and signed by all of the parties. Finally, the signed Recorded Agreement was different from the Ancillary Agreement, granting "exclusive" grazing rights over the entire ranch property to Held, apparently for a lifetime encumbrance upon the Platt and Welu properties, while Welu and Platt's usage rights were subject to termination upon sale or transfer. All parties acknowledged, although in differing degree, that the usage rights were not accurately memorialized in the Recorded Agreement. The District Court found that "due to mistake, the parties signed a document that did not reflect their mutual intent as to 'usage rights.'"

¶26     We conclude the District Court's findings were supported by substantial evidence, and that it correctly concluded that the Recorded Agreement did not reflect the parties' intent. The mistakes in the Agreement constituted "vital facts" that defeated the parties' contractual intentions. *South*, 275 Mont. at 401, 913 P.2d at 235. It was therefore appropriate for the District Court to consider extrinsic evidence and to reform the contract to reflect the parties' true intent. We thus consider whether the District Court erred in the manner that it reformed the Recorded Agreement.

¶27     Held acknowledges the District Court correctly modified the Recorded Agreement to fix the "scrivener's error," so that his grazing usage rights terminated in the same manner as the other parties' rights, but argues that the court erred by further modifying the termination provision. Herd argues the District Court incorrectly interpreted the Agreement, and Exhibit 25, to require that, if one party sold his tract, then the *remaining* two parties lost their respective usage rights on the sold tract. Rather, Held argues the parties intended to agree that if one party sold his tract, then only the *selling* party lost his usage rights to the two remaining tracts.

¶28     Both parties cite to Exhibit 25, which again states, in pertinent part:

> NOT transferring the hunting, grazing and recreational rights; Lance, we've decided it's better if these 'extended rights' don't survive us, nor are they transferable. In other words, if Welu's die or sell, the only hunting rights their survivor/buyer has will be on their own land. . . . In essence then these extended rights are only through our lifetimes. Leaving future owners to negotiate their own deals. . . .

Platt and Welu testified to their understanding that the reciprocal use rights of all the parties would terminate upon the sale of any of the parcels by any party, or upon the death of any

17

of the parties. Welu explained that his purpose in entering the transaction was to obtain hunting rights to the entire ranch, but that he did not believe he would retain those rights in the event either Platts or Helds sold their individual parcel. Held testified to his belief that the parties had a larger expectation of the usage rights, including, in his case, that his grazing rights on the other parcels would survive a sale or transfer by Platt or Welu.

¶29 From the evidence, the District Court found as follows:

The parties intended to grant each other non-exclusive, non-transferrable licenses, revocable by the licensors upon death of a licensee or the sale of the licensors' respective parcels. Thus, the parties intended that [] each of them could sell their respective parcels free of the usage rights they granted in favor of the other parties. In other words, despite the provision as to irrevocability during their lifetimes, the parties (as licensors) intended to retain the power to revoke the usage rights upon sale of their own parcel. For example, if the Held Parcel is sold to a person or entity not owned primarily by Held, Held can revoke Welus' hunting rights and Platts' recreation rights as to the Held Parcel as of the date of recording of such conveyance.

¶30 The parties' offered viable arguments from the record about their view of the parties' intent. Once it became necessary to consider extrinsic evidence, the District Court was entitled as the factfinder to weigh this testimony and assess its credibility. Further, it carefully traced, assessed, and entered findings of fact about each of the many communications in the Tonn File. It rejected, for example, Held's argument that his grazing rights were intended to be "exclusive" in the sense that a buyer of Platts' or Welus' parcel could not graze livestock upon the buyer's parcel during Held's lifetime.

¶31 Upon review of the record, we conclude that the District Court's findings of fact are supported by substantial evidence, and that its interpretation of the agreement among the parties was correct. We conclude the District Court did not err by considering extrinsic

evidence and revising the agreement in a manner that captured the parties' intentions pursuant to § 28-2-1611, MCA.[6, 7]

¶32  Affirmed.[8]

/S/ JIM RICE

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR

---

[6] The District Court also determined that fraud provided an additional basis for reformation of the contract. Having affirmed the District Court's reformation upon mutual mistake, we decline to address the alternate basis for reformation.

[7] Noting the District Court's Conclusion of Law # 73, which states "[a]s revised herein, the usage rights are non-assignable," Held also argues that the District Court erred "in concluding that [the Held Appellants] were barred from leasing out their grazing rights to third parties." Although the argument is not entirely clear, we believe Held is challenging the loss of his right to lease to third parties his grazing rights on the Platt and Welu parcels. To clarify, while we affirm the District Court's determination that the usage rights were non-assignable and "not transferrable" (Conclusion of Law #25), we do not read these conclusions of law, taken in the context of the usage rights at issue, to prohibit Held from leasing out the grazing rights on his *own* parcel. The "usage rights" involved only the right of the parties to use the other two parcels. As acknowledged by Welus on appeal, "the usage rights did not exclude each individual owner's use of their own parcel for any purpose," citing Conclusion of Law #20.

[8] Held's briefing raises three additional issues, but provides only several sentences and no authority supporting his arguments for these issues in his opening brief. "Parties must present a reasoned argument to advance their positions, supported by citations to authority. M.R.App.P. 12(1)(f) [now 12(1)(g)]. When a party fails to do so, our caselaw is well-settled. We will not consider unsupported issues or arguments." *Griffith v. Butte Sch. Dist. No. 1*, 2010 MT 246, ¶ 42, 358 Mont. 193, 244 P.3d 321 (citation omitted).